# CHARLESTON.

D. T. DRUMMOND *et al. v.* WHITE OAK FUEL COMPANY

(No. 5919)

Submitted October 21, 1927.    Decided October 25, 1927.

1. MINES AND MINERALS—*"Surface," Without Qualifying Phrase in Deed, Ordinarily Means Only Superficial Part of Land.*

   The word "surface" when used without any qualifying phrase in a deed, ordinarily signifies only the superficial part of land.    (p. 371.)

2. SAME—*Absolute Support is Due Surface Tract, Unless Right Thereto is Impaired by Deed.*

   Absolute support is due a surface tract unless the right thereto is impaired by deed.    (p. 372.)

3. SAME—*Rule That Surface of Land is Entitled to Absolute Support Applies Only to Surface in its Natural State.*

   The rule of absolute support applies only to the surface "in its natural state".    (p. 372.)

4. SAME—*Damages for Diversion of Percolating Water Supplying Surface Spring or Well by Mining Operations, Unless Accompanied by Subsidence or Fissure of Surface, Cannot be Recovered.*

   The rule of absolute support has no application where percolating waters, supplying a surface spring or well, are diverted by mining operations conducted in the usual way, unless the diversion occurs in connection with a subsidence or fissure of the surface.    If the surface is supported, the diversion is *damnum absque injuria*.    (p. 372.)

Error to Circuit Court, Fayette County.

Action by W. T. Drummond and others against the White Oak Fuel Company. Judgment for defendant, and plaintiffs bring error.

*Affirmed.*

*Osenton & Lee* and *C. R. Summerfield,* for plaintiffs in error.

*Dillon, Mahan & Holt,* for defendant in error.

HATCHER, PRESIDENT:

The plaintiff is the owner of approximately six acres of surface in Fayette County. The defendant is mining a seam of coal thereunder. This is an action for damages to a well on the surface tract which plaintiff claims was drained by reason of the removal of the coal. The plaintiff secured a verdict for $1,500.00 which was set aside by the circuit court of said county.

Plaintiff's tract is a portion of twenty acres of surface which was severed from the minerals in 1896. William Duncan at that time owned the entire estate. He granted to B. F. Bibb (Tr.) "all the surface land and only the surface" of the twenty acres. The grantor reserved the right to use such parts of the surface "as is necessary to mine and transport the coal and minerals underlying such surface land". The deed contained no reservation of the minerals and no specific rights as to their removal, except the surface right stated above. There is nothing in the deed, therefore, to enlarge the grantor's common law rights of removal. It contains nothing to take from the surface owner his common law right of subjacent support.

The well is situate within a few feet of plaintiff's property line. It was drilled in February 1925. It is about six inches in diameter and one hundred seven feet deep. It contained about thirty-five feet of water until July 1, 1925, when it went dry. At the place where the well was drilled the coal is 515 feet below the surface. The well is over rooms 11 and 12 on the eighth left entry of defendant's mine. The coal was all mined out from these rooms, and the pillars "pulled"

not later than October 1, 1924, which was several months before the well was drilled. The plaintiff testified that during June of 1925 he heard rumblings and felt the earth shake on several occasions. A witness for him stated that about June 1925 there was an increase of water in defendant's tenth left entry, and that there was considerable rock fall in the mine in July of 1925, but he knew of no falls closer to the eighth left in that month that some on the tenth left entry. (These two entries are 1200 feet apart.) One witness had never known of slate and rock falls in defendant's mine extending higher in the strata overlying the coal than 20 to 25 feet. Another witness had seen one fall occurring on the ninth left entry, in April 1925, which he estimated to extend as high as 75 feet. Defendant's superintendent testified that the falls in the mine did not ordinarily extend higher than 25 to 30 feet; that while the roof always fell in upon the removal of all the coal, he had never known such falls to extend to the surface of that particular mine; that he had never known the surface to be broken by falls in any mine which was 500 feet below the surface; and that the water from the eighth left did not drain into the tenth left entry. As to the drainage, however, he was contradicted by a witness for plaintiff.

The declaration charges the loss of the well water to the removal of the coal "underlying plaintiff's said land in the vicinity of plaintiff's said well" without leaving pillars of coal or artificial support. The evidence shows that immediately following removal of all the coal in this mine, the roof falls and continues to fall until it "arches" sufficiently to support the overhead strata. One of plaintiff's witnesses said: "The falls follow you as you take the coal out." Another: "Sometimes it falls just directly after the coal is taken out, and at other times it stands for—I have known it to stand for several days." It would therefore seem that the interruption of the strata immediately overlying rooms 11 and 12 must have occurred on or within a few days after October 1, 1924. As there was no diversion of the percolating waters from over those rooms at that time or for many months afterwards, it would seem that no connection direct or

indirect is inferable between the removal of the coal there-from and the injury to the well.

The plaintiff must rely on a disturbance of strata in de-fendant's mine on or near July 1, 1925. No fall was shown to have occurred about that date closer to the well than the tenth left entry—1200 feet from the rooms underneath the well. There is no evidence that the tenth left entry was under plaintiff's property. If not, there would be a variance between the allegation and proof. Even if we assume the tenth left to be under the plaintiff's property, what connec-tion is there between an increase of water on the tenth left in June and the drainage of the well on July 1st? It was not shown that the jars and rumblings in June testified to by the plaintiff emanated from the tenth left entry or, in fact, came from defendant's mine. The plaintiff testified to no tremors or noises prior to October 1, 1924, during the period within which the pillars were being withdrawn from directly under the place where his well was afterwards drilled. He did not testify to any disturbances in April 1925 when the big fall occurred in the ninth left entry. It is hardly reason-able that falls of strata under and near his well should pro-duce no noticeable effect on the surface or on the supporting sandstone, while falls more remote should affect it so seriously.

If it be assumed that the falls of strata on the tenth left did produce the jars and rumblings noticed by plaintiff in June, how do the phenomena of June account for the event of July 1st? There was no decrease of the wellwater in June. The plaintiff says the water drained out between 9 A. M. and 1 P. M. on July 1st. It would therefore seem likely that the diversion is due to something which occurred on the morning of July 1st. The plaintiff was at home that morning, yet he does not relate noticing any rumblings or jarrings at that time. The origin and the causes which direct the course and movements of percolating waters are ordi-narily unknown and concealed. They are not discoverable from surface indications. The mystery of their movements, however, does not relieve plaintiff of the burden of proof. 40 C. J. 1202-3. He cannot recover even under his theory of this case upon conjecture. Coincidence is not sufficient,

but evidence clearly associating as cause and effect the one occurrence with the other event is requisite. The evidence is not at all satisfactory; but if we concede that it traces the depletion of the well to the removal of the coal, then is defendant liable at law therefor?

When the word surface is used in a grant of land, it creates a severance of the land into two parts, and *prima facie* refers only to the soil which covers the minerals—the *"vestimenta terra"*. *Gas Co.* v. *Comm'rs.*, 75 Kan. 335; *Dolan* v. *Dolan*, 70 W. Va. 76 (79). A mere surface grant has sometimes been likened "to the upper story of a building entitled to support from below but covering none of the subjacent support." *Erickson* v. *Iron Co.*, 50 Mich. 604 (609). In using the word "surface" the layman in casual conversation, as well as the judge in a considered opinion, ordinarily refers merely to the superficial part of land. Snyder on Mines, Sec. 1030, defines the word "surface" as including all the soil and strata "superincumbent on the mines". This definition is fancied by some courts. We cannot apply it here, however, as there is no reference in the deed to any mine. When a conveyance, after designating the surface, denotes the other section of the land in a reservation, the surface has in some cases been held to embrace all that portion of the land not specifically set apart in the reservation. For example, if in addition to granting the surface, a conveyance should reserve only the coal, some courts would construe the word "surface" in such case to embrace all of the land except the coal. See *Ramage* v. *So. Penn Oil Co.*, 94 W. Va. 81; 31 A. L. R. 1509, and cases there cited. That situation does not arise here. It is, therefore, unnecessary for this Court to now enter into the conflict waged around those decisions. While there is a reservation here affecting the surface itself, there is no reservation of any other portion of the land. Consequently, there is nothing in the deed to give the word "surface" a secondary meaning. *Ramage* v. *So. Penn Oil Co.*, *supra*, is quoted at length in plaintiff's brief as supporting its contention. But Judge Meredith, who wrote the opinion, is careful to state (p. 99) that the Court did not pass on the meaning of the word "surface"

when used as the subject of a conveyance where no reservation or exception is made. He admits (p. 98-9 and 102) that if a grant be of the surface without any qualifying reservation or exception, it may include only the solum or soil and not the minerals.

The authorities say that absolute support is due a surface tract, unless the right thereto is impaired by deed, *Cole* v. *Coal Co.*, 95 W. Va. 702 (704); 1 R. C. L. 396-7; 40 C. J. 1195-6-7. It was clearly the intention of Duncan to have preserved intact whatever estate he did grant, as he made no reservations in derogation of its support. Now, if we say, as plaintiff contends, that the grantor included the sandstone and other strata above the coal in the word "surface", then it would follow that he must have intended such strata—as a part of the surface—to be properly supported. Coal cannot be mined in quantity without breaking the overlying strata. As Duncan lived in a mining community, he was unquestionably cognizant of this ordinary incident to mining. It is therefore illogical for us to assume that with this information in mind he would have deliberately burdened the coal, a substance of great value, with the support of strata commercially valueless. Consequently, we find nothing either in the deed or the circumstances attending it to enlarge the ordinary conception of the word "surface".

A grant of the surface necessarily includes sufficient subjacent sandstone or other strata to support the soil. It is not requisite here that we say just what thickness of strata is included in this grant, as defendant's mining has not disturbed the strata immediately supporting the soil. It may be admitted for the sake of argument that the sandstone penetrated by the well is necessary for the support of the soil and is consequently a part of the plaintiff's estate; but that admission would not warrant a recovery under the rule of absolute support. That rule applies only to the surface as it was "in its natural state", i. e., in its condition when severance occurred. At that time the well was not in existence. Support of the surface so as to conserve the waters of a well to be drilled nearly thirty years later and drilled after all the coal had been removed was assuredly not within the con-

templation of the parties to the severance. Such support is a maintenance the grantor did not undertake, and is an additional servitude on the grantor's estate. The plaintiff cannot by his own act enlarge the liability of the servient estate. The integrity of plaintiff's surface as it was at the date of severance has been preserved. That is the whole extent of his right to subjacent support. The rule of support for surface *in its natural state* is so well settled that Snyder, *supra,* Sec. 1021, says it has become axiomatic. ''Whenever there has been a separation in ownership of the mines beneath the surface from the surface, the owner of the latter, in the absence of an agreement to the contrary, has an absolute right to have the surface supported precisely as it was in its natural state''. Jones on Easements, Sec. 597, p. 486-7. ''All that can be claimed by the owner of the surface under the right of subjacent support is that no physical injury be wrought to the surface in its natural state, or as contemplated at the time of the grant.'' *Marvin* v. *Mining Co.,* 10 N. Y. 538; *Godfrey* v. *Coal Co.,* 82 W. Va. 665; *Humphries* v. *Brogden,* (Eng.), 12 Ad. & Ell. N. S. 739 (744); *Pringle* v. *Coal Co.,* 172 Pa. 438; *Burgner* v. *Humphrey,* 41 Ohio St. 340; *Gilmore* v. *Driscoll,* 122 Mass. 199 (201); *Jackson Hill Co.* v. *Bales,* 183 Ind. 276; *Sloss-Sheffield Co.* v. *Sampson,* 158 Ala. 590 (594); annotation page 134, 135 Am. St. Rep.; 18 A. & E. Ency. Law 557; 18 R. C. L. 1244-5; 40 C. J. 1195.

Plaintiff contends, however, that water is necessary for the beneficial enjoyment of his property; that wells must have been contemplated by the parties at the time of the severance, in which case he has an implied easement in the water bearing strata beneath his soil; that he was therefore within his rights in drilling where he did for water, and that plaintiff owed support to the waters which gathered in his well. The authorities signally fail to support this conclusion.

Subsurface waters which do not exist in known and defined channels are deemed percolating waters. *Pence* v. *Carney,* 58 W. Va. 296. They are not governed by the rules of law applied to water courses. 30 A. & E. Ency. Law 311. On the right to divert percolating waters we find two lines of decisions. One line upholds an absolute right of diversion.

The~other line concedes only a qualified right thereto. The first line of cases is headed by *Acton* v. *Blundell,* an English case decided in 1843, and reported in 12 M. & W. 324. That decision and those which follow it are based on and emphasize the maxim *cujus est solum ejus est usque ad coelum et ad inferos.* One of the first cases in the United States to question the absolute right of diversion is *Bassett* v. *Salsbury,* 43 N. H. 568, 82 Am. Dec. 179. That case (as well as others which support it) is based on the maxim *sic utere tuo ut alienum non lædas.* It restricts the land owner "to a reasonable exercise of his own right, a reasonable use of his own property in view of the similar rights of others". The second line of cases points out that in *Acton* v. *Blundell, supra,* (and in most of the cases which follow it) there was no wanton destruction of a neighbor's rights, but the party complained of was performing an act which was directly and naturally connected with the enjoyment of his own property. Therefore the advocates of a qualified right say that the same conclusion could have been reached in the other line of cases had they harmonized *cujus solum,* etc., with *sic utere,* etc. The principles advocated by the two lines of cases, as well as the courts which have subscribed thereto, may be found in 30 A. & E. Ency. Law, 310-314, inc.; 27 R. C. L. 1171 to 1178, inc.; 3 Farnham on Waters, Sec. 938; and in the elaborate opinions of *N. Y. Continental Co.* v. *Jones,* (D. C.) 37 L. R. A. (N. S.) 193; *Meeker* v. *East Orange,* 77 N. J. L. 623, 25 L. R. A., (N. S.) 465; *Stillwater Co.* v. *Farmer,* 89 Minn. 58, 93 N. W. 907; *Katz* v. *Walkinshaw,* 141 Cal. 116, 99 Am. St. Rep. 35; *Hathorn* v. *Gas Co.,* 194 N. Y. 326, 128 Am. St. Rep. 555; *Schenk* v. *Ann Arbor,* 196 Mich. 75, Ann. Cas. 1918-E, 267; and *Rouse* v. *Kinston,* 188 N. C. 1, 35 A. L. R. 1203.

The rule limiting the right of diversion is called the "reasonable use" or "American" rule. It is now supported by the decided weight of authority and was approved by this Court in its opinion in *Pence* v. *Carney, supra,* (305). That case does not seriously attempt to define the rule of "reasonable use", but says it has been held to apply to any purpose for which a land owner "might legitimately use and enjoy his land". *Meeker* v. *East Orange, supra,* is perhaps the

most elaborate opinion supporting this doctrine. Its state-
ment of the uses permitted by the rule has been generally
accepted by text writers and decisions, and is as follows:
"This does not prevent the proper user by any landowner
of the percolating waters subjacent to his soil in agriculture,
manufacturing, irrigation, or otherwise; nor does it prevent
any reasonable development of his land by mining or the like,
although the underground water of neighboring proprietors
may thus be interfered with or diverted." See also 27 R.
C. L. 1176, Sec. 94, and Secs. 10 and 11 of an extensive
annotation to *Barclay* v. *Abraham,* 10 A. & E. Dec. in Eq.
681 (704-5-6).

It is settled law that the extraction of minerals is a *rea-
sonable use* of property and if percolating waters are diverted
by mining operations conducted in the usual way and the
superficies is undisturbed, it is *damnum absque injuria.*
Farnham, *supra,* Sec. 939; 30 A. & E. Ency. Law 316; Lind-
ley on Mines, Sec. 814; Snyder on Mines, Sec. 331; White on
Mines, Sec. 239. "The grantee of minerals beneath the
surface is not liable to the owners of the surface for the loss
of springs occasioned by the ordinary working of the mine."
*Coleman* v. *Chadwick,* 80 Pa. St. 81, 21 Am. Rep. 93. The
opinion in that case says: "Mining must interfere more or
less with those subterranean streams and percolations of water
which appear upon the surface as springs; to say that the
owner of the substrata shall be accountable in damage for
their disturbance, is to say that he shall have no use what-
ever of his minerals, for, without interfering to some extent
with such waters, mining is impossible." To same effect are
*Wheatley* v. *Baugh,* 25 Pa. St. 528, 64 Am. Dec. 721; *Green-
leaf* v. *Francis* (N. Y.) 18 Pick. 117; *Ellis* v. *Duncan,* (N. Y.)
21 Barb. 230; *Swett* v. *Cutts,* 50 N. H. 439; *Chase* v. *Silver-
stone,* 62 Me. 175, 16 Am. Rep. 419; *Southern Pac. Rr. Co.* v.
*Dufour,* 95 Cal. 615; *Sloss-Sheffield Co.* v. *Sampson,* 158 Ala.
590. This principle is not only supported by modern au-
thority, but is the outgrowth of the Roman law, as stated in
the Pandects, which Tindal, C. J., eulogized in *Acton* v. *Blun-
dell, supra,* as "the fruit of the researches of the most learned
men—the collective wisdom of ages". "*Cum eo, qui in suo*

*fodiens, vicini fontem avertit, nihil posse agi; * * *.si non animo vicini nocendi, sed suum agrum meliorem faciendi, id fecit.''* Lib. 39, Tit. 3.  A fair translation of this is:  With him who, digging in his own, turns aside the water of his neighbor, nothing can be done * * * if he did it, not with the purpose of injuring his neighbor, but of improving his own land.

*Ohio Coll. Co.* v. *Cooke,* 107 Ohio St. 238, is confidently relied upon by plaintiff.  That case supports instead of opposes the above doctrine.  It does hold that when springs or wells are destroyed by removing underlying coal ''so that there is a subsidence of the surface, there can be recovery''.  But it makes recovery dependent entirely upon such a subsidence.  It draws a clear line of distinction between cases where the disturbance of a spring or well is due to subsidence of surface and those where loss of percolating waters is due simply to the removal of the coal—no superficial subsidence appearing—and holds in the latter class of cases *there can be no recovery,* (pages 259 of opinion).  That distinction is also drawn with exceeding clarity in a charge to the jury approved in *Kistler* v. *Thompson,* 158 Pa. 139 (141).  Referring to the mine owner, the court said: ''If he leaves sufficient support to keep up the surface, and the surface is not disturbed, and a spring of water is diverted from its natural channel by the simple operations of the mine by striking some hidden stream, he would not be liable for the loss of the spring under circumstances of that kind; but if he fails to leave sufficient support, and the support that is necessary to keep up the surface being withdrawn the surface subsides and cracks, and that is the cause of the diversion of the stream of water from where it comes out of the ground and makes a spring, then he would be liable.''  *Patrick* v. *Smith,* 75 Wash. 407, cited by plaintiff permitted recovery by owner of a well whose water supply was lost following work performed by contractors on an adjoining tract.  The opinion is apparently not based on negligence on the part of the contractors, but it is perhaps justified under the view that the well was destroyed, as the opinion says, because of ''an unusual blast of powder''.  *United States* v. *Alex-*

*ander,* 148 U. S. 186, is also cited by plaintiff. That case permitted recovery by the .owner of a well which was destroyed in the construction of work performed under an Act of Congress. The opinion however stated (p. 192) that it was based on the provisions of the Act authorizing the work and specifically recognized as sound doctrine, in the absence of legislative enactment, that when the owner of land in digging thereon for his own purpose intercepted or drained off the water which would otherwise have collected in his neighbor's spring or well, that this inconvenience to his neighbor fell within the description of *damnum absque injuria,* which could not become the ground of an action. *Stone Gap Coal Co.* v. *Hamilton,* 119 Va. 271, is also relied on by plaintiff. Point 6 of the syllabus, if taken alone, favors him. Point 8 opposes him. We find from the opinion, however, that the same distinction is made in that case as is made in *Ohio Coll. Co.* v. *Cooke, supra.* (See pages 296-7.)

Law, well settled, therefore denies plaintiff's demands, even upon a consideration of the evidence most favorable to him. The judgment of the circuit court is affirmed.

*Affirmed.*