**ISLAND CREEK COAL COMPANY, Appellant,**

v.

**Jewell RODGERS and Elsie Rodgers, Appellees.**

**CIMARRON COAL CORPORATION, Appellant,**

v.

**Jewell RODGERS and Elsie Rodgers, Appellees.**

Court of Appeals of Kentucky.

Oct. 1, 1982.

Discretionary Review Denied Feb. 9, 1983.

C. Alex Rose, Louisville, William A. Logan, Richard L. Frymire, Joe A. Evans III, Michael D. Hallyburton, Madisonville, for appellants.

Terry Noffsinger, Evansville, Richard E. Hibbs, Madisonville, for appellees.

Before GANT, McDONALD and VANCE, JJ.

McDONALD, Judge:

This is an appeal of a blasting case. It was tried as a lead case, and many others remain to be tried. The appellants, Island Creek Coal Company and Cimarron Coal Corporation, received adverse judgments against them in the circuit court. They prosecute their appeals separately.

The jury awarded the Rodgerses $50,000 in damages for injury to their home. Fifty percent of the award was assessed against Island Creek and 50 percent against Cimarron. In addition, Cimarron Coal Corporation was assessed $45,000 in punitive damages.

### Factual Background

The appellees, Jewell and Elsie Rodgers, sued to recover damages to their home located in Sharp Subdivision, just east of Madisonville in Hopkins County. The subdivision is located above Island Creek's East Diamond Mine which is composed of 5,000 acres of underground mines, containing seams of coal 90 feet and 250 feet below the surface. The mining operations under Sharp Subdivision were begun in 1905 by the West Kentucky Coal Company, Island Creek's predecessor in title. The operations have been abandoned since 1971.

Mr. Jewell Rodgers has been employed by Bearing Service Company for over 30 years. His employment is related to the mining industry, and he personally makes business calls on mine operations. In 1966 the appellees built their home, knowing that the house was situated over underground mines and that other subdivisions in the area built over mines had trouble with subsidence. Subsidence is defined as,

[A]ny movement of the soil from its natural position. This movement may be in any direction. It may be of surface or subsurface soil. A shifting, falling, slipping, seeping or oozing of the soil is a subsidence within the meaning of the term as used in this Chapter.

*Restatement (Second) of Torts* § 817, comment *h* at 68 (1977).

Cimarron Coal Corporation engaged in strip mining in various areas sought and east of Sharp Subdivision, within 5,600 to 23,000 feet of the subdivision. The property Cimarron was mining had been acquired from Island Creek in 1967. Cimarron used strip mining methods with explosives in order to fragmentize the rock and soil so the coal would be exposed.

On April 29, 1977, the appellees experienced an earthquake-like blast which they claim caused the damage to their home.

### The Evidence As It Related To Island Creek.

The Rodgerses and Cimarron offered proof through expert testimony that the abandoned mines were left with insufficient pillar support.

According to Island Creek, uncontradicted evidence showed that in 1905, when the mineral fee severance occurred, modern-day land development and subdivisions were not only unheard of but unthought of. Island Creek did not begin mining by the underground method until 1948, and they continued until 1963.

An expert for Island Creek testified as follows:

[Island Creek had] done an excellent job of designing and mining both the Number 11 and Number 9 coal seams and had left more than adequate coal to support the surface in its natural state for an indefinite time (100 years or more) and that the only known conditions which could have produced subsidence in the Sharps area were the discharge of sewage into the old mines, or blasting operations of Cimarron, or a combination of the two.

He further explained that the sewage discharge would result in a softening of the fire clay which in turn would permit the remaining pillars to "punch" down through the fire clay, increasing the load and strain upon the large sandstone layers which support the surface. He explained that the repeated blasting from Cimarron resulted in the failure or fracture of the support members which caused a subsidence.

*The Evidence As It Related To Cimarron*

The Rodgerses testified that on April 29, 1977, at 11:40 p.m., there was a shaking and jolting of their home followed by a terrific blast. The next morning they discovered their damage.

Cimarron's blasting records established that the blast shot consisted of 16 drill holes 32 feet deep, each containing 275 pounds of anfo, a mixture of ammonium nitrate and fuel oil. The holes were shot 25 milliseconds apart. The blast site was located about 13,200 feet from the nearest part of Sharp subdivision.

Cimarron's expert testified that the blast, *if more than 5,600 feet from the house*, would be too remote to cause direct damage as the Rodgerses complain. Cimarron's experts concluded that the blasting did not contribute to or accelerate the subsidence. The subsidence, they felt, was caused by Island Creek's extracting coal from the seams under the subdivision; by the seams' having inadequate support in the mines; and by the use of an unacceptable mining practice of not lining up the panels or passageways of Nos. 9 and 11 seams. They theorized that when Island Creek abandoned or closed the mine and terminated its pumping operations, water accumulated in the mine and the fire clay softened, causing the support pillars to sink. Lastly, Cimarron's experts stated that Island Creek failed to leave a barrier pillar for support immediately under the Sharp subdivision.

The trial, expertly handled by the trial court, spanned 20 days and included an exhaustive list of witnesses. A review of the record shows that the array of expert testimony corroborates and then, on the other hand, contradicts each and every claim and defense made by the parties. We will discuss the asserted errors in the order they were argued and briefed.

I

ONE WHO MINES COAL BY UNDERGROUND METHOD OF MINING HAS AN OBLIGATION TO LEAVE ONLY THAT AMOUNT OF COAL WHICH WILL SUPPORT THE SURFACE IN ITS "NATURAL STATE"; AND "NATURAL STATE" MEANS THE SURFACE IN ITS CONDITION AND USE TO WHICH THE SAME WAS BEING PUT OR ANY USE OF THE PROPERTY WHICH WAS CONTEMPLATED, AT THE TIME OF THE MINERAL SEVERANCE.

Island Creek proved that the severance of the coal from the fee occurred in 1905. It argues that the uncontradicted evidence established that when the severance occurred, the subdivision in which the Rodgerses' property was located was a remote woodland and it was not possible for a modern-day subdivision to have been developed upon the property. It is argued further that in 1905 bare subsistence required at least 50 acres, and a one-half (½) acre subdivision lot certainly would not have been adequate for that purpose. Beyond that, running water, electricity, indoor plumbing and gas service, which are indispensable to the development and use of modern day subdivisions, were not available in rural Kentucky. Island Creek vigorously contends that there was no obligation, legal or otherwise, to support the surface in contemplation of development of a modern subdivision.

■ The unquestioned law of Kentucky is that an underground mine operator is obligated to support the surface and leave it in its "natural state." *West Kentucky Coal Company v. Dilback*, 219 Ky. 783, 294 S.W. 478 (1927), states at page 479:

As we have said, the right to mine is subservient to the right of the surface owners to have the surface maintained in

its *natural state* free from subsidence or partings of the soil, and this right of support is absolute and not dependent upon any questions of negligence. [Emphasis ours.]

The question of liability of an underground mine operator for damages to structures on the surface which were built after the underground operations had been abandoned is a matter of first impression in Kentucky. What constitutes "natural state"? Island Creek advances the argument that the definition of "natural state" is the surface as it was when the coal rights were severed (in this case, 1905). The Rodgerses argue to the contrary. They claim it makes no difference when the coal rights were severed because strict or absolute liability on the underground mine operator for any damage to the surface is applicable, the only exception being that if subsequent structures are put on the surface, the underground operator would not be liable for any damage attributable to the structures themselves causing or contributing to the subsidence. The Rodgerses remind us that the weight of the house had nothing to do with the cause of the subsidence, as their uncontradicted expert testimony verified.

 It is easy to follow Island Creek's argument to the contrary, and it's a good one. If Island Creek's responsibility is fixed at the year 1905, the year of the fee severance, then it would be responsible for only remote and rural farmland; certainly no liability would exist for damage to a modern house in a subdivision 72 years later. Island Creek is armed with authority from foreign jurisdictions to support this position, namely, *Marvin v. Brewster Iron Mining Co.,* 55 N.Y. 538 (1874); *Collins v. Gleason Coal Co.,* 140 Iowa 114, 115 N.W. 497 (1908); *Paull v. Island Coal Co.,* 44 Ind.App. 218, 88 N.E. 959 (1909); *Drummond v. White Oak Fuel Co.,* 104 W.Va. 368, 140 S.E. 57 (1927); and *Noonan v. Pardee,* 200 Pa. 474, 50 Atl.Rep. 255 (1901). To the contrary, we define "natural state" as the condition of the surface, including reasonable and forseeable improvements

thereon, at the time the coal is severed, not from the fee, but from the earth.

Also, our review of Kentucky law convinces us that strict liability is applicable. In *West Kentucky Coal Co. v. Dilback, supra,* the court dealt with damage to a well. There the coal company was operating an underground mine not a far distance from the house of the appellee. The Dilbacks' complaint stated that the coal company was negligent because it did not leave sufficient support for the overlying surface after removing the coal, which caused a cave-in, thereby destroying the Dilbacks' well. Even though the case was one concerning lateral support, as opposed to subjacent support as in our case, the court made the following statement:

> We find no proof in the record that the taking of the coal from adjacent property was negligently done. If the coal had been taken from under the property of appellees and a subsidence had been caused thereby, appellant would be responsible for the resulting damage, regardless of whether the mining operation had been conducted negligently or otherwise.

> As we have said, the right to mine is subservient to the right of the surface owners to have the surface maintained in its natural state free from subsidence or partings of the soil, and this right of support is absolute and not dependent upon any question of negligence. But this doctrine ought not to be extended any further than applying it to the surface above the mining operation.

> . . . . .

> If the operation had been carried on under the land of appellees, the appellant would have owed to them the absolute duty not to disturb the natural condition of the surface, but as the operation was not going on under the land of appellees, the appellant is responsible only if it can be shown that the operation was conducted negligently.

*Id.,* 219 Ky. at 784–85, 294 S.W. 478.

In the case of *Nisbet v. Lofton,* 211 Ky. 487, 277 S.W. 828 (1925), pillars were being removed that supported the surface. Sub-

sidence damaged an existing home on the surface. Our highest court approved an instruction which strongly hints of strict or absolute liability. In part, the Court said:

[T]hat it was the duty of ... in mining and removing the coal, to leave in place such amount of coal and so located as to support the plaintiff's surface, and that if the defendant ... knowingly permitted these pillars to be removed in whole or in part, and that as a direct result, the surface of plaintiff's land was caused to subside, they [the jury] should find for the plaintiff.

This general theme falls in line with the *Restatement (Second) of Torts* § 820, comment *b* at 79 (1977):

The liability ... is strict in the sense that it exists although no subsidence is *intended* or *foreseeable,* and although in removing the subjacent support the *utmost care and skill* are used to prevent a subsidence. This liability extends only to naturally necessary subjacent support, as defined .... [Emphasis ours.]

Naturally necessary subjacent support is that support which the supported land itself requires and which in its natural condition it would require. It does not include the support needed because of the presence of artificial additions on or other artificial alterations in the supported land.

■ We conclude that the trial court was correct in overruling Island Creek's motion for directed verdict and judgment notwithstanding the verdict. Island Creek should be held liable for the natural state of the surface, as we have defined it, as of the time it last took coal from the earth in 1963. We find no error in the trial court failing to define "natural state" as submitted by Island Creek.

II

THE TRIAL COURT ERRED IN ITS INSTRUCTION TO THE JURY ON DAMAGES AND THE ADMISSION OF APPELLEE'S VALUATION EXPERT WITNESS TESTIMONY.

■ The measure of permanent damage to real estate in Kentucky is the difference in the fair market value of the real estate just before and after the injury. *United Fuel Gas Company v. Rowe,* Ky., 375 S.W.2d 264 (1964); *River Queen Coal Company v. Mencer,* Ky., 379 S.W.2d 461 (1964); *Kentucky Stone Company v. Gaddie,* Ky., 396 S.W.2d 337 (1965); and *Nisbet v. Lofton, supra.*

■ If the injury is not permanent but temporary, then the measure of damage is the reasonable cost of repair. *Edwards & Webb Const. Co., Inc. v. Duff,* Ky., 554 S.W.2d 909 (1977). The cost of repair is "reasonable" only if it does not exceed the difference in the fair market value of the property before and after the injury.

The Rodgerses' only expert witness for valuation purposes gave the following testimony:

1. The value of the Rodgers residence before the injury: $67,000.

2. The value of the residence after the injury: worthless. [At another point he stated that the value of the buildings was $5,126.06.]

3. The cost to repair the damage: $55,873.94.

4. The value of the bare land: $6,000.

The jury awarded $50,000 on the above testimony. Before the jury was testimony also that the Rodgerses insured the residence for $60,000 after the damage had occurred, and it was assessed in 1978 for tax purposes for $47,000.

More pointedly, the expert's testimony was attacked as being incompetent. He lived 250 miles from Madisonville and never appraised property in Hopkins County. He only appraised three or four tracts in Kentucky within the last 20 years. The Rodgerses argue that his qualifications were uncontradicted and unchallenged and that it is within the sole discretion of the trial court to declare whether or not an expert is qualified. *Lee v. Butler,* Ky.App., 605 S.W.2d 20 (1979).

■ It is without question that the trial court has the responsibility to accept or

reject an expert's qualifications. If the qualifications are acceptable and the court adopts the witness as an expert, it means that the witness may offer opinion evidence to the court and jury, even if based on hearsay. *Kentucky Power Company v. Kilbourn,* Ky., 307 S.W.2d 9 (1957). The court, by adopting the witness as an expert, really only gets him to first base, so to speak. The witness's expert status does not mean that everything he testifies about is automatically acceptable: his testimony must also be competent, and other factors come into play. In the instant case, while the witness was qualified in his field, on the other hand he was only remotely personally knowledgeable about the subject matter he was testifying about; specifically, the values involved. *See* R. Lawson, *Kentucky Evidence Law Handbook,* §§ 3.0, 6.10 (1976).

In the case of *Com. v. Citizens Ice,* Ky., 365 S.W.2d 113 at 115 (1963), the former Court of Appeals stated, with regard to the testimony of an expert witness:

Once [the expert] has established his professional qualifications and testifies that he has made a sufficient study of the real estate market in the community to form an opinion as to the market value of the property in question, and has viewed the property, then we think his opinion will support a verdict *unless it is patently extravagant or unless in the process of examination or cross-examination it is shown that in fact he has not made a sufficient canvass of the local market to justify an opinion, or that he has not seen the property.* [Emphasis added.]

Mr. Banawitz's testimony concerning the value of this property appears at first blush to be "extravagant." At certain points in his testimony he indicated that the value of the Rodgers property was $6,000. Since the land itself was valued at $6,000, it follows that the house itself was worth nothing. Yet the Rodgerses continued to live in the house, had had it insured, and continued to pay taxes on it. Even if we use the alternate figure of $5,126.06 given by the witness as the value of the building, the testi-

mony becomes only slightly less "extravagant."

Mr. Banawitz's figure obviously was arrived at by subtracting from the $67,000 value before the injury all the items constituting his "cost to cure" figure. The "cost to cure" is not the Kentucky standard: that standard is the reasonable cost to repair. *Edwards, supra.* The expert witness's "cost to cure" or cost to repair is reasonable only if the market value of the property after the injury, including the land and its improvements, is less than $6,000 or less than $11,126.06. In other words, the Rodgerses are only entitled to the *lesser* of the reasonable cost of repair and the difference in fair market value before and after the injury.

A reading of testimony of the Rodgerses' expert witness makes it apparent that he did not consider in his calculations the amount the property would bring at a sale. On cross-examination the following testimony was elicited:

Q Tell the jury, Mr. Banawitz, what kind of a study you did in the city of Madisonville or its environs to determine whether or not houses which have damages similar to that in the Rodgers' house are marketable and salable.

A Actually, not too much. I asked these real estate brokers this question, didn't get too much help .... I measured the damages as I've told you, by the best method that I know.

$\cdot$ $\cdot$ $\cdot$ $\cdot$ $\cdot$

Q Is it your opinion that the value of the Rodgers' home which you attribute to it, after damage, is based solely on what's known as cost to cure?

A Yes, cost to cure which, of course, your cost to cure and your value, we're getting pretty close ....

Later, in response to the judge's explanation of a question that had been asked, the expert stated that he could not answer the question how much the property would bring at a sale. After a discussion, he amended this to state that the answer to the question of how much the property would bring at a sale was $6,000. His testi-

mony made it apparent, however, that he had made no study of the local market to arrive at this figure, since it was the same as his "cost to cure" figure subtracted from the value of the house.

■ Because the expert's calculations as to the cost of repair of the property and its resulting value were patently extravagant, and because by his own testimony he made no canvass of the local market to determine what the property would bring at sale, it is our opinion that the expert witness's opinion will not support the verdict in this case. *Com. v. Citizens Ice, supra.* We reverse on this account.

### III

CIMARRON, ALONE, ASSERTS THAT THERE WAS NO CREDIBLE EVIDENCE TO SUPPORT THE GIVING OF A PUNITIVE DAMAGE INSTRUCTION; AND ADDITIONALLY, IT WAS ERROR TO GIVE A PUNITIVE DAMAGE INSTRUCTION AGAINST ONLY ONE OF THE JOINT DEFENDANTS (NAMELY, CIMARRON); AND THE GIVING THEREOF GAVE UNDUE PROMINENCE TO THE BLASTING ASPECTS OF THE CASE, TO THE PREJUDICE OF CIMARRON.

■ We view the evidence differently than Cimarron. Punitive damages are authorized only when the circumstances surrounding a tortuous act indicate malice, willfulness or a reckless or wanton disregard for the rights of others. *W.T. Sistrunk and Company v. Meisenheimer,* 205 Ky. 254, 265 S.W.2d 467 (1924). Cimarron continued its blasting after the Rodgerses had personally complained and residents had presented to Cimarron a petition against the blasting. Even if Cimarron conducted its original blasting in the innocent belief that no damage would result therefrom, the complaints and petition put it on notice that damage was claimed. Further blasting continued and the jury was entitled to believe that it was in reckless disregard of the rights of the residents in

view of the jury finding that such blasting was a substantial factor in causing damage.

In *Louisville Builder Supply Company v. City of Richlawn,* Ky., 392 S.W.2d 438 (1965), it was stated:

> The company also contends that punitive damages were not warranted because the finding that it removed the trees maliciously is unauthorized. At the time of their removal there was a dispute between the Company and Richlawn as to which one owned the land upon which the trees were located, but it is not denied that these trees were planted by Richlawn and were removed by the Company over Richlawn's specific protests....
> the removal of the trees was accomplished in wanton and willful disregard of the rights of Richlawn.

*Id.* at 439–40.

Cimarron complains that the trial court erred by defining punitive damages for the jury in its instructions and relies upon *Southern Railway Co. v. Barr's Adm'r.,* 21 Ky.L.Rev. 1615 (not reported in the Kentucky Reports), 55 S.W. 900 (1900). The case is of questionable binding authority; however, it does say that it is objectionable for an instruction on punitive damages to speak of punishing a defendant and furnishing an example to deter others from like conduct.

Here, the trial judge defined for the jury the term "punitive damages" by stating, "They [punitive damages] are awarded against a person to punish him for his outrageous conduct and to discourage such person and others from similar conduct in the future." We perceive this to be good practice notwithstanding *Southern Railway Co., supra.* Why have jurors knocking on the door with questions about "punitive damages?" If they are explained beforehand the jury is less confused. This procedure falls in line with Justice Palmore's direction, "When words or expressions not commonly understood by the general public are used in instructions they must be defined." 2 J. Palmore, *Instructions To Juries,* § 1311(m) (1977).

■ The punitive damages instruction followed the general principles set out in

*Bisset v. Goss,* Ky., 481 S.W.2d 71 (1972). We find no error in this regard.

■■■■ Also, contrary to Cimarron's contention, the trial court may properly give punitive damage instructions against only one of the joint defendants. Here, the evidence did not warrant such instruction be submitted against Island Creek. On the other hand, however, consideration of punitive damages was warranted against Cimarron. They are to be considered, as an enhancement of ordinary damages, in light of the character of wantonness, recklessness, or maliciousness of the acts complained of by the plaintiff. *See Harrod v. Fraley,* Ky., 289 S.W.2d 203, 205 (1956).

Since we have reversed the ordinary damages and made them subject to a retrial, we think it only fair to send the punitive damages feature back as well to be retried. We do this because the punitive damages are an enhancement of the ordinary damages, and the jury should consider them together.

### IV

CIMARRON NEXT COMPLAINS THAT THE VERDICT IS INCONSISTENT ON ITS FACE AND THAT IT WAS ERROR TO SIMULTANEOUSLY SUBMIT TO THE JURY ISSUES INVOLVING STRICT LIABILITY AND PUNITIVE DAMAGES.

■■■■ Cimarron argues that it is totally inconsistent for the jury to have found that Cimarron's blasting caused no direct damage but merely contributed to or accelerated the subsidence in conjunction with Island Creek's failure to provide sufficient support for the surface, and at the same time to have found that Cimarron alone was responsible for the punitive damages. Cimarron relies on *Smith v. Webber,* Ky., 282 S.W.2d 346 (1955). Its argument is unpersuasive because the *Smith* case, *supra,* turned on the fact that the jury's verdict was inconsistent by awarding $500 in hospital and doctor expenses when the undisputed proof was that these expenses were much more. By finding for the plaintiff, the *Smith* jury compromised undisputed proof. We are not persuaded the verdict in the present case is inconsistent. We see no

problem with holding one defendant (Island Creek) liable for compensatory damage on the theory that it is absolutely liable for failure to adequately support the surface regardless of whether its mining activities were negligent, and holding another defendant (Cimarron) liable for compensatory damages to the extent that its blasting contributed to the subsidence, and further holding that defendant liable for punitive damages if its blasting was done in reckless or wanton disregard for the rights of others.

■■■■ The strict liability theory is supported by a number of cases. *Juett v. Calhoun,* Ky., 405 S.W.2d 946 (1966), tells us that Kentucky has expressly renounced the "negligence" theory in blasting cases. The standard is strict liability. *Clement Brothers Company v. Everett,* Ky., 414 S.W.2d 576 (1967), tells us that it is unnecessary to prove negligence in blasting cases, only causation. *Wolf Creek Collieries Company v. Davis,* Ky., 441 S.W.2d 401 (1969), tells us that liability for blasting does not rest on negligence.

We fail to see where Cimarron was prejudiced by the court's instructions in this regard.

Inasmuch as there will be a retrial of the damages aspects of this case, it is necessary that we discuss some issues that may have a bearing upon the new trial. By addressing these following issues we do not intend to unduly handcuff the trial judge in conducting the new trial, but we do respectfully offer the following as an aid to him.

### V

IT IS ASSERTED THAT THE TRIAL COURT ERRED IN PERMITTING CO-PLAINTIFFS OF THE RODGERSES, WHOSE CLAIMS HAD BEEN SEVERED, TO TESTIFY ABOUT THEIR DAMAGES.

The court adopted the Rodgers case as the lead case and bifurcated it from numerous other plaintiffs' cases. The severed co-plaintiffs of the Rodgerses were called and testified about their own damages in varying degrees. Cimarron claims that their testimony should have been suppressed and

excluded on two counts: 1) Their testimony violated a pretrial order of the trial court which the trial court refused to enforce; and 2) their testimony was immaterial and collateral to the issues being tried.

We fail to agree with Cimarron. Naturally, the court should enforce its pretrial orders, as the pretrial order is the guide for the litigation. However, on this particular point any mistreatment, real or imagined, that Cimarron feels resulted from the failure of the trial court to enforce its pretrial orders can now be reasserted and corrected at the new trial. So that point is moot. Our main point of difference with Cimarron is that we do not agree concerning the testimony of the co-plaintiffs.

Cimarron's pleadings denied the damage, and an expert for Cimarron testified that no direct damage would result in excess of 5,600 feet from the blasting site. The Rodgerses' residence was in excess of 13,000 feet from the blasting site and their testimony demonstrated direct damage. We say that any witnesses, co-plaintiff or not, who had evidence of direct damage from the blast would qualify to testify about the blasting, particularly if they suffered direct damage and were situated in excess of 5,600 feet from the blasting site. These witnesses may describe the blast and what it did to their property to demonstrate its severity. They should not be permitted to testify about any dollar value of damage. Along the same lines, the trial court should exclude testimony about blasting which occurred prior to 1975, except as to how that would bear, if it does, on the punitive damages. It may be that the trial court would want to further bifurcate the proceedings by separating the ordinary damages from the punitive damages if it feels that undue prejudice would result from lumping all of the claims and their proof together. Regardless, these matters fall within the trial court's discretion under CR 42.02.

The defense's reliance on *Brucker v. Gainesboro Telephone Co.*, 125 Ky. 92, 11 S.W. 240 (1907) is misplaced. There the plaintiff tried to prove, but was not allowed to, an event (electric shock through a phone) by another person's shock over a different phone, at a different time and location. The holding in *Brucker, supra,* does not persuade us on the proposition that the co-plaintiffs here should be disqualified in testifying about their damages.

## VI

IT IS ALLEGED THAT THE TRIAL COURT ERRED BY REFUSING TO ALLOW THE APPELLANTS TO CROSS-EXAMINE THE CO-PLAINTIFFS' WITNESSES CONCERNING THEIR INTEREST AND BIAS.

On this point, the appellants had a right to reveal to the jury the fact that the witnesses were also plaintiffs, and that their cases would be subject to later trials. While we agree with the trial court that such circumstance does not mean the co-plaintiffs have any financial interest in the outcome of the Rodgers case, the co-plaintiffs did have lawsuits pending against the defendants for which they were seeking damages. Although they had no direct financial interest in the verdict in the subject case, the co-plaintiffs had an interest in the result of the case if for no other reason than that it might affect their chances for settlement in the cases to follow. Under such circumstances, the court should have allowed the co-plaintiffs to testify. *See* R. Lawson, *Kentucky Evidence Law Handbook,* § 4.05 (1976).

However, we are able to find no avowal in the record as to what the testimony of the co-plaintiffs would have been. We are therefore unable to determine to what extent the testimony of the co-plaintiffs would have overcome the strength of the expert testimony against Cimarron.

## VII

APPELLANTS COMPLAIN THAT THEY WERE NOT PERMITTED REASONABLE CROSS-EXAMINATION OF THE ADVERSE PARTY'S WITNESS TO DEMONSTRATE THAT THE AURA CREATED BY THE WITNESS IS NOT A CANDID PORTRAYAL OF THE EVIDENCE HE OFFERS.

Examination of this issue supports the trial judge. His rulings were totally

**350**

discretionary. We find no abuse of discretion and the law does not permit us to intrude in a trial to the point where we would be substituting our impressions for those of the trial judge.

## VIII

THE TRIAL JUDGE ERRED BY EXCLUDING THE BEST AVAILABLE EVIDENCE CONCERNING THE EFFECT OF THE BLASTING ON THE SUBSTRATA.

We don't agree. After the litigation began, the Kentucky Department of Mines and Minerals placed a geophone in the No. 9 seam of Island Creek mine, and later Cimarron placed one in No. 11 seam of abandoned Island Creek mine. The purpose was to measure and record vibration levels and determine the effect of blasting.

The trial court suppressed the evidence by refusing to let it be presented to the jury.

The defense cites *Greenwell v. Commonwealth,* Ky., 317 S.W.2d 859 (1958), to show the trial court's ruling as error. It does no such thing. In *Greenwell, supra,* the trial judge permitted testimony about experiments outside of the courtroom. The trial judge was upheld because the ruling was discretionary in nature. We are sure, under the same authority, that if the trial court had ruled to the contrary it also would have been upheld.

It is assumed that the geophone readings were excluded because they were made long after the damage had occurred and the trial court was not satisfied that the conditions which might affect the reading were the same. No measurements were available to show the violation levels on the dates of the alleged injury. We can find no abuse of the trial court's discretion in this regard.

The remaining unanswered issues will be cured by the retrial of this case. Therefore, in summary, we affirm the jury verdict in the trial court in its holding Island Creek Coal Company and Cimarron Corporation liable for ordinary and punitive damages, and in the percentage of fault so determined by the jury; but we reverse and order a new trial on the issue of the amount of damages to be awarded.

All concur.