James JEWELL, Appellant,

v.

COMMONWEALTH of Kentucky, Appellee.

Supreme Court of Kentucky.

March 11, 1977.

Thomas D. Shumate, Peter J. Flaherty, III, Shumate, Shumate & Flaherty, Richmond, for appellant.

Robert F. Stephens, Atty. Gen., Robert W. Hensley, Asst. Atty. Gen., Frankfort, for appellee.

PALMORE, Justice.

James Jewell appeals from a judgment entered pursuant to a jury verdict finding him guilty of murder and fixing his sentence at 20 years' imprisonment. KRS 507.-020, 532.060(2)(a). He claims errors in the following three particulars:

(1) Rejection of evidence pertinent to his affirmative defense of insanity under KRS 504.020;

(2) Reception of evidence relating to his intoxication in terms of the presumptions enacted in KRS 189.520; and

(3) Refusal to instruct on the defense of intoxication under KRS 501.080(1).

The victim of the killing was Taylor Jewell, appellant's father. He was shot in the chest with a .20-gauge shotgun while seated in a chair on the front porch of his home reading his mail. The only other persons present were James and his sister Violet, who is described in the evidence as having been institutionalized for a mental problem and was unable or unwilling to describe the fatal event. The incriminating evidence was provided by James himself through statements made on the scene and afterward to the various investigating officers. According to their testimony, he first said that he had had to shoot his father in self-defense. Later on, in jail, he said that he wanted the car and some money to go and get himself some more beer but his father kept refusing him and he just had to kill him.

James was a single man 48 years old and had lived at home with his parents all of his life. His mother had passed away some two years before the tragedy. He had a crippled leg and had been taking medicines prescribed for a nervous condition over the course of 15 or 18 years. Though he had no formal education, he had learned to sign checks, bought his medicines at the drug store, and was licensed to drive an automobile.

On the day of the shooting Sheriff Hershell Lynch arrived on the scene at 1:30 P.M., about 10 minutes after he had received word of it. He described James as "pretty well drunk at the scene," but said that his talk was "very distinguishable, he answered all the questions," and that he appeared to know where he was and what had happened. Deputy Sheriff Julian Har-

ris, who arrived a little later, testified that James was drunk when taken to jail.

James also made a statement to District Detective Robert Davidson while he was in custody waiting to be taken to jail. According to Davidson, "he was drunk while he was telling me this."

At 5:46 P.M. on the same day, some 4½ hours after the shooting, James took a breathalyzer test administered by Floyd McIntosh, a detective for the Kentucky State Police. According to McIntosh, James was still drunk at that time. The test indicated a blood-alcohol content of 0.11%. Over objection by the appellant, Detective McIntosh was permitted to explain that for purposes of driving an automobile a content of 0.10% is equated with being under the influence of intoxicating beverages. He went on to say that among the many breathalyzer examinations he had given there had been one score of 0.32% and that person had been able to walk. Asked whether James was "real bad drunk on this occasion," he answered as follows: "No, he wasn't what you are saying he wasn't real drunk. You can be drunk and be real drunk he read 0.11% and was capable of walking around; after you get up in 0.20% or around 0.30% you usually pass out depending on the person."

During cross-examination Detective McIntosh estimated that James "could have sobered up anywhere from 0.04% to 0.08%" between 1:30 P.M. and 5:30 P.M., which means, of course, that he could very well have had a blood-alcohol content close to 0.20% at the time of the shooting.

On the day following his arrest, when he was no longer under the influence of alcohol, James again told Detectives Davidson and McIntosh that the shooting had resulted from an argument in which his father would not let him have some money and the use of the automobile.

It appears from the record that while he was in jail James got into such a mental state that he had to be sent to the Lakeland psychiatric institution. From there he was transferred by order of the trial court to the River Region Hospital in Louisville. Meanwhile, in a KRS 202.135[1] involuntary hospitalization proceeding held by the Jefferson Circuit Court on October 31, 1975, he was found to be mentally ill and was ordered to accept treatment at the forensic medicine facility in Louisville for an indeterminate period of time.

The next step in the instant proceeding was an order of the trial court entered on May 18, 1976, noting that James had been confined in the Kentucky State Hospital for hospitalization and treatment and had now been declared ready for release, and directing that he be remanded to jail. He was tried for murder on June 23, 1976.

James testified in his own behalf at the trial and denied having shot his father. He also stoutly denied having been drunk. At the same time, however, he insisted that he had no recollection whatever of the events in question, as illustrated by the following excerpts from his testimony:

On direct examination:

Q. Do you know who did it?

A. No, I was so crazy I didn't know a thing until they got me in Louisville hospital.

Q. Do you know about how many days that was after your father was killed?

A. No, I don't.

Q. There is testimony to the effect you told the officers you and your Daddy got in argument over the keys to the car and your right to drive the car, do you recall anything of that nature?

A. No.

Q. There is also testimony you told the officers you shot your Daddy for the reason that he was about to kill you or in self defense, do you remember that?

A. When they come I was crazy and that is the truth.

Q. Wait   .   .   .

A. I was crazy, I didn't know nothing.

1. Since repealed and superseded by KRS 202A.060.

Q. You have no recollection of shooting your Daddy?

A. No.

Q. Did you have any quarrel with him over money?

A. I had money, no.

Q. Did you have a quarrel with your Daddy over him spending your money?

A. I never killed him.

Q. You don't think you killed your Daddy?

A. No.

Q. They brought you to jail and said you was drunk when they saw you up there shortly after the shooting and they brought you to jail do you remember talking to the officers in the jail?

A. No, I was crazy; I didn't know nothing that is the truth.

Q. When did you first come to your senses or know anything?

A. When they took me to Louisville they give me that there glucose and went to giving me some nerve pills and I went to getting better.

Q. You did not know anything until you got to Louisville?

A. No, not nothing.

*   *   *   *   *   *

Q. You mean you came to your senses in the Louisville General hospital is that right?

A. Yeah.

Q. If you had been at your self, in your right senses would you have shot your father?

A. No sir, I wouldn't. I didn't shoot him.

Q. Did you have any malice or ill feeling toward your Daddy?

A. No.

Q. And then were you later taken to the insane asylum at Danville, Kentucky?

A. Yeah.

Q. You remember being taken there do you?

A. Yeah.

Q. And you remember how long you stayed there?

A. I stayed there about seventy-five days.

On cross-examination:

Q. Mr. Jewell, would you pull that microphone down just a little more and look at the jury and talk right up, I believe it is your testimony that you don't remember anything that happened on September 13, 1975, is that right?

A. Don't remember nothing.

Q. You don't remember killing your father?

A. I don't know what happened.

Q. You don't remember whether you was drunk or sober?

A. I wasn't drunk; they said I was drunk, but I wasn't.

Q. You remember not being drunk?

A. I wasn't drunk; they swore a lie.

*   *   *   *   *   *

Q. Did you get on a drunk?

A. No, I never got on no drunk.

Q. In September, 1975?

A. No sir.

Q. How do you know you never if you can't remember?

A. I know I never got on no drunk when they said I was drunk they told a damn lie; I will tell them that.

Q. Now let me ask you this, if you can't remember anything how do you know you weren't drunk?

A. I wasn't drunk; I was crazy; that is the reason they took me to Louisville to the crazy hospital to try to get straightened out.

Q. You could have been drinking as well as crazy?

A. I was crazy. That is a God damn lie.

We come now to the assignments of error.

KRS 504.020 provides that a defendant, after giving the notice required by KRS 504.050, may prove in exculpation that when he committed the act in question he

was afflicted with a mental disease or defect that deprived him of substantial capacity to appreciate the criminality of the act or, if he did appreciate it, to conform his conduct to the requirements of the law. Essentially, this is the defense of insanity set forth in *Terry v. Commonwealth,* Ky., 371 S.W.2d 862, 865 (1963), and as explained in that opinion, fundamentally it is a refinement of the old M'Naghten and "irresistible impulse" tests. In the M'Naghten aspect it confines "right" and "wrong" to a legal vis-a-vis moral sense. *Id.,* at 371 S.W.2d 865.

Counsel sought to prove the insanity of James through lay testimony by his brother and sister and a certified copy of the October 31, 1975, judgment of the Jefferson Circuit Court finding him to be mentally ill. All of this evidence was ruled inadmissible.

"It is well settled in this state that persons who are not experts, but by association and observation have had an opportunity to form an opinion as to the sanity of a person, may testify to that opinion; giving also, the facts upon which the opinion is based, so that the jury may judge for themselves what weight the opinion is entitled to. Insanity is often shown by the flash of the eye, an expression of the face, a movement of the muscles, or a number of slight circumstances which, while they may produce a conviction in the mind of the observer, cannot, in many cases, be reproduced before the jury as they were exhibited to the eye of the witness, so that, if testimony of this sort were not allowed, great injustice would in many cases be done. The judgment of a person's intimate friends and acquaintances as to his soundness of mind is therefore always competent in cases of this character." *Abbott v. Commonwealth,* 107 Ky. 624, 628, 21 K.L.R. 1372, 55 S.W. 196, 198 (1900).

Minnie Garrett, James' sister, had known him all of her life, 46 years. She was asked whether from her observation of him in the jail and ·her acquaintance with him throughout the years she could give an opinion "whether . . . he had enough mind and memory to know right from wrong." After an objection had been sustained and the question was read to her in chambers for avowal purposes, she responded, "He had never been capable of taking care of his—" but was admonished by the trial court (during the avowal) to answer "Yes" or "No" and to confine herself to the time she saw James in jail after her father's funeral, whereupon she replied as follows: "He didn't when I talked to him at the jail, no."

The following opinion of Perry Jewell, a brother of James, as preserved by avowal also was held inadmissible:

Q. "At the time you saw him in the jail after the funeral and talked with him and observed him state whether or not you in your opinion the defendant, James Jewell, had sufficient mind and manner [sic] to know the difference between right and wrong."

A. "No sir, I don't think he did in my opinion."

■ As counsel for James contends, it is, or should be, elementary that this type of evidence is competent on the issue of sanity, whether in a civil or criminal proceeding. Wide latitude must be given to the way in which a lay opinion is expressed, and it is not inadmissible merely because the question is couched in terms of the capacity to distinguish between right and wrong, or because it invades the jury's prerogative, or because it is not confined to the precise time of the offensive act. See *Banks v. Commonwealth,* 145 Ky. 800, 141 S.W. 380, 384–385 (1911), in which the subject was thoroughly considered and discussed by the late Judge Carroll.

■ A certified copy of the judgment of the Jefferson Circuit Court finding James mentally ill was offered, but the trial court excluded it on the ground that "the way to prove this is to bring people in here that examined him and have them testify or either take their depositions." This clearly was in error. See *Smedley v. Commonwealth,* 138 Ky. 1, 127 S.W. 485, 488–489 (1910). The term "lunacy" has long since been replaced in the statutes by "mentally

ill," and "lunacy inquest" by the more euphemistic "determination of mental condition," [2] but the principle here involved remains the same.

■ We are unable to say that the errors in excluding the opinion testimony of James' brother and sister and the judgment of the Jefferson Circuit Court as probative evidence on the issue of insanity were not prejudicial. It is a tragedy, of course, that this state does not make adequate provision for the safekeeping of deranged people who have demonstrated harmful propensities by acts of violence against others. Certainly they do not belong in penal institutions, but in the absence of some kind of realistic provision for their detention a prosecutor can truthfully remind the jury, as he did in this case, that in the event of an acquittal on grounds of insanity there is very little, if any, assurance that they will not soon be at large again.[3] Even so, however, the trial of such a person must conform to the principle that insanity is a defense, and the defendant must be allowed to prove it in accordance with the accepted rules of evidence.

■ Though it was held in *Overstreet v. Commonwealth*, Ky., 522 S.W.2d 178 (1975), that in a felony case the jury should not be informed of the presumptions established by KRS 189.520, we need not decide whether Detective McIntosh's testimony in that respect was prejudicial. As one who had administered blood-alcohol examinations on many occasions he qualified as an expert in his own right, and it was within his special competence to relate the percentages to degrees of drunkenness based on his personal observation of other persons he had tested. On another trial, however, reference to the statute should be avoided.

KRS 501.080(1) provides that intoxication (even though it may have been voluntarily induced) is a defense to a criminal charge if it negates the existence of an element of the offense. The burden of proof remains with the Commonwealth, cf. KRS 500.-070(1), but the difficult question that arises is whether the evidence in a given case requires that the defense be specifically embodied in the instructions. In this case the pertinent element is intent.

The Kentucky Penal Code codifies or reenacts several "defenses," including ignorance or mistake (KRS 501.070), intoxication (KRS 501.080), duress (KRS 501.090), self-protection (KRS 503.050), protection of others (KRS 503.070), protection of property (KRS 503.080), use of force in law enforcement (KRS 503.090), immaturity (KRS 504.-010), entrapment (KRS 505.010), and others. The only significant difference between these defenses and a simple denial by the defendant that he committed one or more of the essential elements of the crime is that when the defense is raised it requires an instruction calling it to the attention of the jury. A defense is so raised by the presentation of evidence that could justify a reasonable doubt of the defendant's guilt. The sufficiency of the evidence to accomplish that purpose is a question of law for the courts to determine on a case-by-case basis.

■ Mere drunkenness will not raise the defense of intoxication. Cf. *Richards v. Commonwealth*, Ky., 517 S.W.2d 237, 241 (1975). This continues to be so under KRS 501.080(1). There must be something in the evidence reasonably sufficient to support a doubt that the defendant knew what he was doing. Thus in *Mearns v. Commonwealth*, 164 Ky. 213, 175 S.W. 355 (1915), in which the defendant testified that by reason of his extreme drunkenness at the time he had no knowledge of taking the money he was accused of having stolen, or of being in the room where the theft was alleged to have occurred, this court held that he was entitled to an exculpatory instruction on

---

**2.** Cf. KRS 202A.010(7); KRS 202A.060. Major changes in terminology were effected by Ch. 67, Acts of 1960.

**3.** KRS 504.030 provides that when a defendant is acquitted on the ground of insanity the court may have him committed for examination and

possible detention pursuant to KRS Ch. 202 (now 202A). As we see in this case, however, after having been committed prior to his trial James was soon released. The lesson likely to be drawn by the jury from that is obvious.

the theory of intoxication. A similar result was reached in *Ray v. Commonwealth,* Ky., 284 S.W.2d 76 (1955), a breaking-and-entering case. Oddly, however, through the years the court clove to the following distinction:

"Voluntary drunkenness . . . is no excuse for perpetration of a crime, yet voluntary drunkenness is an evidential circumstance to be considered in mitigation of the crime charged so as to reduce it from one of higher degree to one of lower degree. And if the crime charged . . . is of such a character that the accused may be convicted of either a higher degree or a lower degree, depending upon the evidence bearing on the question of malice, then no specific instruction relating to the accused's drunken condition is necessary. The *evidence* alone should serve as a *reducer* so as to pull down conviction from the higher to the lower degree, according to the jury's discretion. But if the crime charged . . . is of such a character that the accused may be convicted of only one degree of wrong, then a specific instruction on drunkenness should be given by the court to assist the jury in deciding whether the accused is guilty or innocent, under all the circumstances." *Abbott v. Commonwealth,* 305 Ky. 620, 623, 205 S.W.2d 348, 350 (1947), a malicious cutting and wounding case (old KRS 435.170) in which the defendant was held not entitled to the instruction because he could have been convicted of the lesser included offense of cutting and wounding "in a sudden affray or in sudden heat and passion, without previous malice" (old KRS 435.180).

We characterize this distinction as odd because "malice" and "intent" are not one and the same, and the exculpatory effect of intoxication clearly relates to the capacity to form an intent as well as the capacity to deliberate or premeditate (cf. Roberson's New Kentucky Criminal Law and Procedure, 2d ed., Sec. 59). The two degrees of shooting or cutting and wounding (old KRS 435.170 and 435.180) both required intent, as did murder and voluntary manslaughter (old KRS 435.010 and 435.-020). Yet the distinction was drawn on the basis that drunkenness might eliminate malice, but not intent. It is interesting to note that although it did not follow through and apply its own rationale to the facts of the case, the court in *Slone v. Commonwealth,* 238 Ky. 727, 38 S.W.2d 709, 711 (1931), another malicious cutting case, did summarize its view in this manner:

"Therefore, where there are lower degrees of the offense contained in the indictment, some of which do not contain the element of intent or malicious purpose, then the fact of defendant's intoxication should not be singled out in a separate instruction, or the jury told in any manner what effect, if any, it should give to such intoxication, upon the theory that the jury itself may consider and weigh such fact and give to it such effect as it sees proper under the instructions submitting to it all degrees of the charged crime, just as it weighs any other evidence in the case. But, if there are no degrees of the offense contained in the indictment, or where there are such degrees, *but in them intent is likewise an element,* then in such cases the court should instruct the jury, in substance (if the evidence authorized it), that if defendant was so intoxicated that he did not realize what he was doing, or was incapable of entertaining the necessary criminal intent, then he should be acquitted." (Emphasis added.)

The theory that intoxication alone could have the effect of reducing murder to voluntary manslaughter, regardless of whether there was evidence to suggest a sudden affray or sudden heat of passion, was finally abandoned by this court in *Richards v. Commonwealth,* Ky., 517 S.W.2d 237, 241 (1975). The same reasoning applies to this case, in which the difference between murder (KRS 507.020) and 1st-degree manslaughter (KRS 507.030) as embraced by the instructions depended solely on the presence or absence of extreme emotional disturbance. Therefore, the necessity, vel non, for an instruction on intoxication is not determinable on the old ground that voluntary intoxication could serve only to reduce the degree of homicide. In this instance

both degrees required intent, and they were the only degrees included in the instructions given.

All of the witnesses who observed James at the scene of the shooting described him as drunk. Between four and five hours later, without having consumed any more alcoholic beverages during the interim, he still had a blood-alcohol content of 0.11%. Though he insisted at the trial that he was not drunk, he insisted just as vigorously that he had no recollection of the occasion. There was, therefore, (1) evidence that he was drunk and (2) evidence that for some reason he was out of his mind. We think that this was enough to call for an instruction on intoxication under KRS 501.080.

The judgment is reversed with directions for a new trial.

All concur except that STEPHENSON, J., feels that the evidence of intoxication was insufficient to justify an instruction on that defense.