LaFonda Fay FOSTER and Tina
Hickey Powell, Appellants,

v.

COMMONWEALTH of Kentucky,
Appellee.

Nos. 87–SC–356–MR, 88–SC–776–
TG and 87–SC–364–MR.

Supreme Court of Kentucky.

Dec. 19, 1991.

As Modified on Denial of Rehearing
May 14, 1992.

R. Neal Walker, Asst. Public Advocate, Kevin McNally, McNally & Robinson, Frankfort, for appellant Foster.

Gene Lewter, Lexington, for appellant Powell.

Frederic J. Cowan, Atty. Gen., Ian G. Sonego, David A. Smith, Denise A. Garrison, Todd D. Ferguson, Asst. Attys. Gen., Criminal Appellate Div., Frankfort, for appellee.

SPAIN, Justice.

Appellants, LaFonda Fay Foster and Tina Hickey Powell, were both found guilty by a Fayette County jury of five counts of intentional murder. After a four-week trial, the jury recommended that Powell be sentenced to life imprisonment on one murder count, and to life imprisonment without the benefit of probation or parole for twenty-five years on the remaining four counts. The same jury recommended that Foster be sentenced to death on each of her five murder convictions. The trial court entered respective judgments and sentences in accordance with the jury's recommendations. We affirm the findings of guilt as to both appellants and the punishment as to Powell. We reverse Foster's sentences to the death penalty, however, and remand her convictions for a new punishment hearing for reasons hereinafter discussed.

## I. STATEMENT OF FACTS

On April 23, 1986, the Lexington police responded to a telephone complaint by Virginia Kearns that two intoxicated women were in her apartment and would not leave. Two officers arrived at the Jennifer Road complex at 4 p.m. and found the complainant, Mrs. Kearns, to be highly intoxicated and belligerent. After questioning the appellants and determining that they were not intoxicated, the police left.

Appellants walked to an adjacent parking lot where several people were having a

party. While they were drinking, Powell attempted to sell a knife to raise some money for more alcohol. At about this time, Mrs. Kearns left her apartment. Powell threatened her and then she and Foster followed Mrs. Kearns to a drug store where Foster was seen shaking Mrs. Kearns violently. The three women returned to the Kearnses' apartment where Mrs. Kearns lived with her semi-disabled husband, Carlos, and their live-in housekeeper, Trudy Harrell.

Mrs. Kearns asked her husband to give money to the appellants. He refused the request and an argument ensued. Mr. Kearns eventually agreed to write them a check but stated that he would have to drive somewhere in his car to get it cashed. Roger Keene and Theodore Sweet, friends of Mr. Kearns, arrived at the apartment while Powell, Mrs. Kearns, and Ms. Harrell went to get Mr. Kearns' car.

Foster then drove the car containing Powell and the five ultimate victims to a bait shop where the manager cashed Mr. Kearns' $25 check sometime between 6:00 and 7:00 p.m. Powell stated that she and Foster were attempting to raise enough money to purchase a gram of cocaine.

The appellants next stopped at the home of Lester Luttrell, where an argument between Luttrell and the appellants ended with Foster firing a .22 bullet into the window of his home.

Between 8:00 and 9:00 p.m., the car was driven to a field off Mount Tabor Road. There, according to Powell, the five victims were forced out of the car and told to lie face down in the grass. The appellants then shot and stabbed Ms. Harrell and Mr. and Mrs. Kearns, according to the demonstrative evidence found in the field. Although wounded, the Kearnses, along with Mr. Keene and Mr. Sweet, who were not injured at that time, got back in the car at the appellants' direction.

Ms. Harrell's body was discovered 225 feet from the field in the Berke Plaza parking lot. Her body had become lodged underneath the car and was dragged a considerable distance in the parking lot before becoming dislodged. She was fatally shot in the back of her head, stabbed five times in her face and chest, and her throat had been cut. No alcohol was found in her system.

Powell drove the car to a tavern located two miles from where Ms. Harrell's body was found. A customer of the tavern testified that Powell came up to him and asked if he had any ".22s or .38s," to which he replied that he did not. Powell asked the manager of the store the same question, explaining that she needed them to "shoot some rats." He gave Powell four .22 caliber bullets. The manager observed that the car which Powell was driving had blood on the right passenger door of the car. He yelled to Powell that she had "better wash that blood off." The manager could not clearly see who was in the car but he did notice a "big guy in it, with no shirt on."

The car was driven to a loading area behind a paint store, where Mrs. Kearns was killed. The state medical examiner testified that Mrs. Kearns had been shot in the head, her throat had been cut, and she had multiple stab wounds, including sixteen wounds to her neck. Her body had also become lodged under the car and dragged. Despite the wounds, Mrs. Kearns died as a result of being run over by the car and had a .32 blood alcohol level at the time of her death. A large sweat shirt, identified as belonging to Roger Keene, was found at the scene with blood smears consistent with a knife being wiped off. The blood was identified as belonging to Virginia Kearns.

The appellants returned one hour later to the tavern and again asked the manager for more bullets, without success. The manager observed that the blood he had noticed previously on the car had been wiped off. Foster was driving the car.

Appellants went next to the trailer home of LaFonda Foster's father, where he provided a nail and showed how to use it in the .22 caliber revolver in place of the cylinder rod, which had been lost at the Mount Tabor field. This substitution would have made the firing of the pistol "more difficult," according to the state firearms examiner. Powell stated that while Foster was

inside the trailer the three remaining men begged her to do something to help them. Powell explained that she was unable to help them because Foster had taken the keys to the car and further stated she believed that she could best help them by staying. However, she did not deny that she had honked the car horn for Foster to hurry up.

At an undetermined time during the evening, the appellants stopped at another bar. Carolyn Cross, who was sitting in a car outside the bar, stated that Foster asked her for some money "because she needed a fix." When asked by Ms. Cross what was wrong, Foster replied that "she had just shot a man" and had "told the old man when he got in the car if he bled in the car that she would shoot the old son of a bitch again." When Ms. Cross asked Foster what she was going to do with the rest of the people in the car, Foster replied, "I'll shoot them, too." Ms. Cross further testified that Powell and a man in the car called to Foster and said, "Let's go." According to Ms. Cross, she believed Foster had been drinking but was "in control of herself." She observed that Foster exhibited no problem standing, walking, or communicating. Foster was described as being "calm" and "not in a hurry."

The remaining victims asked the appellants for something to eat, whereupon they went to a drive-in restaurant for food, but left before receiving their order. They then were driven to a field off Richmond and Squires Roads, where they were killed in the same manner as the two women, with each being shot in the head, stabbed repeatedly, throat cut, and run over by the car. The car was then set ablaze with gasoline. Roger Keene, who was shot two times in the back of the head and once in the ear, was left pinned under the car while it burned. Theodore Sweet, who had been shot in both ears, was found lying face down on the ground near the car. Both Carlos Kearns and Roger Keene had defensive injuries to their right hands. An RG .22 caliber revolver with a missing cylinder rod was found in the field near the burning car. The bullets found at the three homicide scenes and inside the bodies of the

victims were consistent with having been fired from this handgun.

A postmortem toxicology report on Theodore Sweet and Roger Keene indicated they had blood alcohol levels of .35 and .22, respectively. Mr. Kearns was transported to Humana Hospital where he died as the result of two gunshot wounds to the head. No alcohol was found in his system. The pathologists listed the penetrating gunshot wounds to the head of Roger Keene as the primary cause of his death, and stated that Mr. Sweet died from "multiple injuries inflicted in multiple fashions."

After setting fire to the car, appellants walked to Humana Hospital on Richmond Road. Powell telephoned for a taxi while Foster went into a bathroom to wash blood off her face and clothes. An emergency room nurse noticed the blood on their clothing and notified the police, who were in the building on an unrelated matter. She observed the appellants were both coherent in speech and able to walk without a stagger.

The police separately questioned the appellants to determine whether they were injured. Foster and Powell both told the police that they had been in a fight with one another, but no injuries were found. The arresting officer noticed an odor of alcohol but observed that both were capable of communicating and walking without difficulty. Foster and Powell were arrested for (and later convicted of) public intoxication when they became belligerent and a "danger to themselves and others." The arresting officers stated they were arrested only because "they were in a public place."

The appellants were then driven to the Fayette County Detention Center. Foster was placed in a holding cell while Powell was being booked. While in the bathroom of the cell, Foster removed her bloody socks and shoestrings and flushed them down the toilet. She then wiped the blood off her shoes with water and exchanged her blood-stained sweat pants with another inmate. The police obtained the unwashed pants from the home of the inmate the next day. Three .22 caliber bullets were found

on the appellants and a blood-stained knife was taken from Powell. The booking of the appellants was videotaped and played during trial, and again upon the request by the jury during their penalty phase deliberations.

During pretrial confinement, Foster told another inmate, Betty McLean, that she had shot the women first and made the men watch. When asked why she killed them, Foster informed Betty and other inmates that the women were "bitches" and the men were witnesses who saw too much. Commenting on one of the victims, Foster stated, "The son of a bitch wouldn't die. He was the hardest man I ever killed." Foster explained that she did not believe that the police could connect the crimes. Foster claimed to Zina Montgomery, another inmate, that she was going to play insane. She also corroborated the fact that she had destroyed evidence.

There are thirty-five assignments of alleged errors asserted on behalf of Foster, and two claims of alleged errors asserted on behalf of Powell. This opinion will focus on all issues addressed by Foster and Powell at oral argument and in their respective Briefs, which, in the opinion of the Court, merit discussion. Issues which we consider to be patently without merit are hereby affirmed without discussion.

## II. DENIAL OF CHANGE OF VENUE

■ During pretrial proceedings, Foster made a motion for a change of venue. After two evidentiary hearings, the trial court denied the motion. Foster claims on her direct appeal that the trial court erred in failing to grant the motion. She complains that the pretrial publicity generated by the multiple homicides tainted her constitutional right to be tried "by a panel of impartial, 'indifferent' jurors." *Irvin v. Dowd*, 366 U.S. 717, 722, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751 (1961).

We find no evidence of a prejudiced community. All potential jurors had heard or read about the case, but only fifty-eight veniremen were required to complete a fourteen-member jury. This is evidence of a community which was not prejudiced.

*Murphy v. Florida*, 421 U.S. 794, 802, 95 S.Ct. 2031, 2037, 44 L.Ed.2d 589 (1975). Twenty of the fifty-eight had formed opinions of guilt. Of the twenty having opinions of guilt, only four stated that they could not put aside their opinions and decide the case on the evidence presented at trial. In addition, seven of the fifty-eight veniremen had formed opinions as to punishment. The trial judge granted ten of the prosecutor's challenges for cause. Nine of the strikes were for not being able to consider imposing the death penalty and the other was for bias. The judge granted seven of Appellant Foster's motions to strike for cause. Three were due to pretrial publicity, two were because the veniremen could not consider appellant's mitigation evidence, one was because the venireman could not consider the minimum authorized punishment, and the other venireman stated that he would automatically impose the death penalty. Three of the jurors who actually sat on the case had tentatively formed opinions of guilt, but the trial judge decided upon further examination that they could put their opinions aside. Taken in the full context of their answers, the trial judge's decision was not erroneous. *Irvin v. Dowd, supra* at 366 U.S. 717, 81 S.Ct. at 1639; *Peters v. Commonwealth*, Ky., 505 S.W.2d 764, 765 (1974). Appellant Foster did not challenge for cause any of the jurors who sat on the case, including these three, indicating strong evidence that Foster "... was convinced the jurors were not biased and had not formed any opinions as to [her] guilt." *Beck v. Washington*, 369 U.S. 541, 557, 82 S.Ct. 955, 964, 8 L.Ed.2d 98 (1962).

■ A trial judge's decision not to grant a transfer "is given great weight because he is present in the county and presumed to know the situation." *Hurley v. Commonwealth*, Ky., 451 S.W.2d 838, 841 (1970). "It is not the amount of publicity which determines that venue should be changed; it is whether public opinion is so aroused as to preclude a fair trial." *Kordenbrock v. Commonwealth*, Ky., 700 S.W.2d 384, 387 (1985), *cert. denied*, 476 U.S. 1153, 106 S.Ct. 2260, 90 L.Ed.2d 704 (1986). The

question of whether a change of venue should be granted is a matter entrusted to the sound discretion of the trial court. *Grooms v. Commonwealth*, Ky., 756 S.W.2d 131, 133 (1988); *Payne v. Commonwealth*, Ky., 623 S.W.2d 867, 876 (1981), *cert. denied*, 456 U.S. 909, 102 S.Ct. 1758, 72 L.Ed.2d 167 (1982). We find no abuse of discretion.

## III. DENIAL OF MOTION TO STRIKE FOR CAUSE

█ Foster next alleges error occurred when the trial court refused her motion to strike for cause veniremen Bernie Short and Kevin McCarty. Although neither venireman sat on the fourteen member jury, Appellant Foster had to use all of her peremptory challenges. For there to be error, she has the burden of showing that her use of a peremptory challenge to strike each venireman "resulted in a subsequent inability to challenge additional unacceptable veniremen." *Marsch v. Commonwealth*, Ky., 743 S.W.2d 830 (1988); *Rigsby v. Commonwealth*, Ky., 495 S.W.2d 795 (1973), overruled on other grounds, *Pendleton v. Commonwealth*, Ky., 685 S.W.2d 549, 552 (1985). Appellant also has the burden of proving bias and preconceived ideas as to these challenged jurors. *Caldwell v. Commonwealth*, Ky., 634 S.W.2d 405 (1982).

█ Our review of the Short and McCarty voir dire gives rise to very little, if any, doubt of their ability to serve on the jury. Initially, both prospective jurors had formed opinions of guilt and punishment, stating that they believed appellant was guilty and that "capital punishment" and the "death penalty" was an appropriate punishment for the crime. But upon further questioning by the trial court, it was determined that these opinions were not strongly held.

Mr. Short, when asked by the trial court whether he could lay aside his opinion and render a verdict based upon the evidence, replied that since being summoned for jury duty, he had a new perspective. He said, "We're talking about being a side-line quarterback. It's a little different being on the side than being in the game. It puts a little different slant on it."

McCarty, when asked the same question, stated that "[g]oing into Tuesday [when voir dire started], probably so, but as to what you [Judge Keller] said as far as the facts and knowing the facts, I really couldn't make that conclusion right now."

When the entire range of penalties permissible was explained, both veniremen stated that the facts and circumstances of the case would dictate what form of punishment would be appropriate. The trial judge made a finding in both cases that Short and McCarty could put aside any opinions and could consider the whole range of penalties.

Based on the trial court's thorough examination of the two veniremen, we cannot say that its decision to overrule Foster's motion to strike for cause was clearly erroneous. *Caldwell, supra.* The use of a peremptory challenge to strike each venireman did not "result in a subsequent inability to challenge additional unacceptable veniremen." *Rigsby, supra, overruled on other grounds, Pendleton, supra.*

The trial court did not abuse its discretion. *Peters, supra.* Error, if any, was harmless beyond a reasonable doubt, when viewed from the overwhelming evidence of guilt against the appellants. *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); RCr 9.24; *Snodgrass v. Commonwealth*, Ky., 814 S.W.2d 579 (1991); *Abernathy v. Commonwealth*, Ky., 439 S.W.2d 949 (1969).

## IV. DENIAL OF SECOND–DEGREE MANSLAUGHTER INSTRUCTION

Foster argues reversible error occurred when the trial court refused to instruct the jury on second-degree manslaughter. Appellant admitted during opening statements that she participated in the homicides, but claimed that she was intoxicated. The trial court explained that Foster was not entitled to the lesser-included instruction because "[t]here is no evidence of wanton or reckless conduct in this case from which a rational finder of fact could make such a finding." However, the jury was instruct-

ed that intoxication would be a complete defense to intentional murder.

■ KRS 501.080 provides that intoxication is a defense to a criminal charge only if the condition negates the existence of an element of the crime. Obviously, one of the essential elements of intentional murder is intent. KRS 507.020(1)(a). In *Hopper v. Evans,* 456 U.S. 605, 102 S.Ct. 2049, 72 L.Ed.2d 367 (1982), the United States Supreme Court held that a defendant in a homicide prosecution is entitled to an instruction on a lesser-included offense if the evidence would permit a jury to rationally find him guilty of the lesser offense and acquit him of the greater. We have held that an accused is entitled to have the defense of intoxication submitted in instructions to the jury if the evidence is sufficient to indicate that the degree of intoxication was at a level which prevented the forming of the intent necessary under the statute. *Parido v. Commonwealth,* Ky., 547 S.W.2d 125 (1977); *Cf. Smith v. Commonwealth,* Ky., 737 S.W.2d 683, 687 (1987).

■ But we have also stated that "the circumstances of voluntary intoxication, standing alone, will never require a voluntary manslaughter instruction." *Moore v. Commonwealth,* Ky., 771 S.W.2d 34, 36 (1988), *cert. denied,* 494 U.S. 1060, 110 S.Ct. 1536, 108 L.Ed.2d 774 (1990). "Intoxication is a defense only if there is something in the evidence sufficient to support a doubt that the defendant knew what he was doing." *Id.* at 36. (Citation omitted.) "Lack of sleep or fatigue is not a defense." *Id.* Neither is a history of past drug and alcohol abuse a defense.

The test for the inclusion of a lesser-included instruction on voluntary intoxication is found in *Stanford v. Commonwealth,* Ky., 793 S.W.2d 112, 117–118 (1990):

> While intoxication may be a defense in a criminal case, it is such only if there is evidence sufficient to support a doubt that the defendant knew what he was doing. In *Jewell v. Commonwealth,* Ky., 549 S.W.2d 807 (1977), overruled on other grounds by *Payne v. Common-*

*wealth,* Ky., 623 S.W.2d 867 (1981), it was held that in order to justify such an instruction there must be evidence not only that the defendant was drunk, but that he was so drunk that he did not know what he was doing. *Meadows v. Commonwealth,* Ky., 550 S.W.2d 511 (1977).

■ We agree with the trial court that there was no rational basis in the evidence to justify an instruction on second-degree manslaughter. Moreover, in our view, the trial court unnecessarily instructed the jury under this evidence that intoxication could be a complete defense to each count of intentional murder. Logic dictates that if there is sufficient proof to justify an instruction on intoxication as a complete defense to intentional murder, then this evidence would necessarily include proof sufficient to justify instructing on the lesser offense of involuntary manslaughter. This is because it takes a more advanced degree of drunkenness for a complete defense than for establishing a wanton (as contrasted with intentional) state of mind for involuntary manslaughter. But the circumstances surrounding this case did not justify *any* instruction on intoxication. There were five victims brutally killed over a period of approximately four hours. The victims each were shot at short range (some being contact wounds), stabbed repeatedly, crushed by a car, and in some instances, burned. They were then left for dead at three separate locations throughout the city. Foster and Powell twice went to find additional bullets and once to repair the gun which they had been using to kill the victims. Foster attempted to destroy evidence immediately before and after being arrested. No evidence of drug use on the day of the murders was presented. Foster's alcohol intoxication may have been at a level to support being arrested for public intoxication but still not to a level where she did not know what she was doing. *Moore, supra; Stanford, supra.* The trial court did not abuse its discretion.

## V. DENIAL OF INSTRUCTION ON WANTON MURDER

■ The evidence presented did not support an instruction on wanton murder.

Wanton murder is not a lesser-included offense of intentional murder. KRS 501.010; KRS 501.020(3). "It is simply murder committed with a different state of mental culpability but murder, whether intentional or wanton, is a capital offense." *Smith, supra.* "It is not proper to instruct the jury on a wanton offense when all the evidence indicates that it would be unreasonable for the jury to believe that the defendant's conduct was anything other than intentional." *Moore, supra* at 37 (citation omitted). The evidence does not indicate wanton conduct. The trial court did not abuse its discretion.

## VI. DENIAL OF INSTRUCTION ON EXTREME EMOTIONAL DISTURBANCE

■ Foster was not entitled to an instruction on first-degree manslaughter as a result of her purported defense of extreme emotional disturbance. *Cf. Holbrook v. Commonwealth,* Ky., 813 S.W.2d 811 (1991); *Smith, supra.* The trial court refused to give a separate instruction but did include extreme emotional disturbance in the penalty phase instructions as a mitigating circumstance. Part of Foster's defense (and mitigation) was that she was raised in a dysfunctional family where she was physically and emotionally abused. Her past drug and alcohol abuse were also presented as explaining why she often lost her temper and directed her "rage" towards people around her. A psychologist, Dr. Noelker, testified that Foster "was an extremely emotionally disturbed child, was an extremely emotionally disturbed adolescent; she is an extremely emotionally disturbed and drug dependent adult."

■ Despite this "evidence," Foster failed to prove that the killings were caused by a "triggering" event. Since the adoption of the penal code, we have undertaken to set out what evidence is required to support an instruction on extreme emotional disturbance. We have explained in prior opinions that the event which triggers the explosion of violence on the part of the criminal defendant must be sudden and uninterrupted. *Smith, supra; McClellan v. Commonwealth,* Ky., 715 S.W.2d 464, 468–69 (1986), *cert. denied* 479 U.S. 1057, 107 S.Ct. 935, 93 L.Ed.2d 986 (1987). It is not a mental disease or illness. *Wellman v. Commonwealth,* Ky., 694 S.W.2d 696, 697 (1985). It is also not equivalent to duress as Powell urges us to believe. *Id.* Thus, it is wholly insufficient for the accused defendant to claim the defense of extreme emotional disturbance based on a gradual victimization from his or her environment, unless the additional proof of a triggering event is sufficiently shown.

Based on our review of the record as a whole, we find that it was not clearly erroneous for the trial court to find that there was "not any evidence" to support "that these killings were done under extreme emotional disturbance." *Smith, supra.*

The trial court also did not abuse its discretion when it refused to reopen the case so that Foster's expert could testify on the definition of extreme emotional disturbance.

## VII. CROSS–EXAMINATION OF DR. NOELKER

■ We find no reversible error in the cross-examination of Dr. Noelker by the prosecution. The prosecutor asked Dr. Noelker to read a letter written by Foster to Lester Luttrell while she was in jail. The Commonwealth then asked the expert if the letter was the type of information he normally used in formulating his opinion. When the expert agreed, the prosecutor read a passage of the letter which told Luttrell not to talk to the police, but to talk to her lawyers. Foster then wrote, "... the motive behind it is to convince the jury that I was mentally deranged from large amounts of excessive use of cocaine." The admission of these statements was proper because the prosecutor has a right to cross-examine an expert about the type of evidence which he or she normally uses in formulating an opinion, as long as the questioning and evidence sought to be admitted is relevant. "The data on which expert witnesses rest their specific opinions, as distinguished from the knowledge which qualifies them to offer opinions at

all, may be fully inquired into on cross-examination." 31 Am.Jur.2d Expert and Opinion Evidence § 92; *See also* IMWINKELRIED, UNCHARGED MISCONDUCT EVIDENCE § 112 (1st ed.1984).

■ However, we believe error occurred, albeit harmless, when the prosecutor questioned the expert on his knowledge of prior acts of misconduct which Foster had committed. In a bench conference and on cross-examination, the expert was asked whether he had knowledge of bad acts which Foster had committed and whether he had utilized such knowledge in reaching his diagnosis that Foster was extremely emotionally disturbed. Dr. Noelker stated that he had knowledge of the acts and that "[t]echnically, I considered everything." The expert then proceeded to inform the jury about 1) Foster shooting her husband in the arm; 2) her shooting at Lester Luttrell; 3) recurrent fights; 4) her theft of a shotgun during the course of a burglary; and 5) an incident where she had shaken her mother "violently."

The testimony as to these bad acts was inadmissible as irrelevant, uncharged misconduct. Though we acknowledge that the Commonwealth, in nearly all cases and with the proper foundation, has the right to question an expert on any matter which the expert has used in formulating his opinion, we believe that the admission of evidence of bad acts in a capital murder trial is highly prejudicial and ordinarily outweighs any probative value the evidence may present in support of the Commonwealth's case in chief. We have consistently stated that "[e]vidence of the commission of other crimes ... is not admissible to prove that an accused is a person of criminal disposition." *O'Bryan v. Commonwealth*, Ky., 634 S.W.2d 153, 156 (1982). (Citations omitted.) Considering the circumstances and proof presented at trial, the admission of these statements was error, but nevertheless harmless beyond a reasonable doubt as to the guilt of Foster. RCr 9.24; *Abernathy, supra.*

## VIII. DENIAL OF SEVERANCE

Foster and Powell both claim that the trial court erred when it refused to grant their respective motions for separate trials. On several occasions prior to and during trial, counsel for appellants moved for a severance. The appellants' grounds for severance were that Powell wanted to introduce evidence which showed Foster's propensity for violence as a basis for Powell's "defense" of duress, and that if she was allowed to do so, Foster would be prejudiced. If she was not allowed to do so, then Powell would be prejudiced. The Commonwealth and the trial court wisely suggested that the problem could be ameliorated by holding a separate penalty phase for each defendant. After considering Powell's evidence at a pretrial hearing, the trial court initially sustained Foster's motion to sever, opining that the evidence which Powell sought to present in the penalty phase would be admissible to show Powell's "degree of involvement" and would therefore be "unduly prejudicial" to Foster. The severance was granted "regardless of Powell's guilty plea." Nevertheless, the indictments were subsequently rejoined after Powell refused to admit at her aborted guilty plea proceeding that she intended to kill the victims.

RCr 9.16 requires separate trials when it appears that a defendant or the Commonwealth is or will be prejudiced by a joinder of the offenses or defendants at trial. "In order to justify the granting of a severance, it must appear that the defendants have antagonistic defenses, or that the evidence as to one defendant tends directly to incriminate the other." *Tinsley v. Commonwealth*, Ky., 495 S.W.2d 776, 780 (1973); *See also Rachel v. Commonwealth*, Ky., 523 S.W.2d 395 (1975). "There is a strong policy in favor of joint trials when charges will be proved by the same series of acts ..." *United States v. Blakeney*, 942 F.2d 1001 (6th Cir.1991) (Citation omitted.); *See also Richardson v. Marsh*, 481 U.S. 200, 209, 107 S.Ct. 1702, 1708, 95 L.Ed.2d 176 (1987).

■ Severance is a matter of judicial discretion and the allegation that there are antagonistic defenses is only one of the factors for the trial judge to consider. *Ep-*

*person v. Commonwealth*, Ky., 809 S.W.2d 835 (1991); *Brown v. Commonwealth*, Ky., 780 S.W.2d 627 (1989); *McQueen v. Commonwealth*, 721 S.W.2d 694 (1984). The movant must show that the antagonism between the codefendants will mislead or confuse the jury. *U.S. v. Horton*, 847 F.2d 313, 317 (6th Cir.1988). "The movant satisfies this burden if he or she shows that the jury was unable 'to separate and treat distinctively evidence that is relevant to each particular defendant at trial.'" *United States v. Gallo*, 763 F.2d 1504, 1525 (6th Cir.1985), *cert. denied*, 475 U.S. 1017, 106 S.Ct. 1200, 89 L.Ed.2d 314 (1986).

### A. GUILT PHASE

As a preface, we find that neither Foster nor Powell was prejudiced by the trial court's denial of a severance during the guilt phase of the trial. Evidence presented by the Commonwealth to convict the appellants was the same except for the additional admission of pretrial statements Foster had made to inmates while awaiting trial. Powell raised no defense and thus did not offer any proof, neither calling witnesses nor testifying herself during the first stage of the joint bifurcated proceedings. Powell's admission of guilt before the jury did not prejudice Foster since the prosecutor did not use it as substantive evidence to convict her. *Askew v. Commonwealth*, Ky., 768 S.W.2d 51 (1989). The trial court properly limited the scope of Foster's cross-examination of witnesses to prevent any reference to Powell's participation. *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968); *Cosby v. Commonwealth, supra*, 776 S.W.2d 367 (Ky.1989).

Powell was properly prevented from introducing any evidence of uncharged criminal misconduct committed by Foster in support of her coercion claim. *See O'Bryan v. Commonwealth*, Ky., 634 S.W.2d 153 (1982). Powell's introduction of evidence of bad acts committed by her codefendant was properly limited to the penalty phase and only for the purpose of supporting her mitigation.

Powell was also not entitled to a guilt-phase instruction on voluntary manslaughter in support of her duress claim because the record indicates that Powell had "intentionally or wantonly placed [herself] in a situation in which it was probable that [she] would be subject to coercion." KRS 501.090(2). The trial court properly relegated Powell's claim of duress to the penalty phase of the trial where it was considered as a mitigating circumstance. KRS 507.020; KRS 532.025(2)(a)6; KRS 503.010 *et seq.*

The remaining allegations of error in the guilt phase which can be directly attributable to the denial of severance are found to be without merit.

### B. PENALTY PHASE

The Commonwealth's sole evidence during the penalty phase was the introduction of Foster's 1982 judgment of conviction of robbery in the second degree, and Powell's 1980 dual conviction of obtaining a controlled substance by fraud and promoting contraband in the first degree.

Foster proceeded first in the penalty phase. She introduced mitigating evidence that she was physically and emotionally abused as a child and that she grew up in a dysfunctional family. Lane Veltkamp, a psychologist and an expert in dysfunctional families, interviewed Foster and her family and based his opinion on these sessions. One of the three interviews was videotaped and played at trial. In the interview, Foster gave a history of her life. Foster stated during the interview that she had shot her husband, cut her brother with a knife, had been charged with carrying a concealed deadly weapon, had been involved in "burglaries" and "breaking and enterings," and had fought with other people. Powell's counsel cross-examined Mr. Veltkamp about the specific acts of violence which Foster had told him about, which he considered in basing his opinion. Foster objected and moved for a mistrial, claiming the evidence was not relevant and that Powell lacked standing to question Veltkamp. The trial court overruled the objection, stating that the specific acts of violence were "very relevant" since they

were introduced by Foster, thus making her "propensity for violence an issue." The court stated, "You not only opened the door but flung the gates wide open." The trial court also ruled that Powell could question the expert about any information on which he had based his opinion. However, the trial court properly refused to allow Powell to ask Mr. Veltkamp about specific acts of violence which he did not consider as a basis for his opinion.

Foster claims the cross-examination of Mr. Veltkamp by her co-defendant was improper. We disagree. A defendant has a right to cross-examine a co-defendant's expert about his qualifications and matters on which the expert had based his or her opinion. Foster first made her character an issue by the introduction of specific acts of uncharged misconduct through her introduction of the videotape. "The first rule of character evidence law, as applied to criminal cases, is that the bad character of an accused cannot be proved until he has elected to make character an issue in the case." LAWSON, THE KENTUCKY EVIDENCE LAW HANDBOOK, p. 27 (2nd ed. 1984); *See Redd v. Commonwealth,* Ky., 591 S.W.2d 704 (1979). We find no error in the admission of these bad acts and the cross-examination thereof by the co-defendant.

Powell began her evidence of duress in mitigation by calling witnesses who testified that Powell had a stable childhood with no history of violence. Witnesses also testified about Powell's nonviolent reputation in the community. Powell then began to provide evidence of her fear of Foster by calling witnesses. Zina Montgomery was recalled to testify about a conversation which she had overheard between Foster and another inmate. Zina claimed she heard Foster state that Powell had gotten "panicky" the night of the murders and that she was planning on killing Powell also because she was a witness and might go to the police. Other inmates testified to similar statements and threats made by Foster towards Powell, including an inmate who testified that Foster had admitted she used the knife on Mr. Kearns. Foster told the inmate that Powell was a "weak bitch" and "not capable of finishing the work."

Powell's sister, Sheila Hickey, testified that Foster had beaten her twice, once requiring hospitalization. Sheila further testified that Foster burned Powell's apartment while a boyfriend was still inside. Sheila further stated that Foster had also beaten Powell.

Powell testified on her own behalf in the penalty phase. She based her fear of Foster on a one-year lesbian relationship during which Foster had beaten her on numerous occasions. Powell also stated that she had knowledge of other violent acts in which Foster had been involved. She stated that Foster had beaten her sister, Sheila, had burned Powell's apartment, and threatened her while they were in jail. Powell also related her knowledge about separate incidents where Foster shot her own husband, cut her own brother, stabbed another man [which charge was dismissed by a grand jury], and hit Powell's boyfriend with a whiskey bottle. Powell claimed that she knew when Foster would become violent. She stated she believed that she would have been killed had she not participated in the killings. On cross-examination, Powell admitted, however, that she had not been threatened by Foster in any manner on the night of the murders.

Foster claims the acts of misconduct testified by witnesses and Powell in support of Powell's mitigation was highly prejudicial to her and required the trial court to sever the penalty phase of the trial.

KRS 532.025 sets forth seven aggravating factors which may be proven against a defendant on trial for capital murder. KRS 532.025(3) requires an affirmative finding of only one aggravating circumstance beyond a reasonable doubt in order to sustain a death sentence. *Simmons v. Commonwealth,* Ky., 746 S.W.2d 393 (1988), *cert. denied,* 489 U.S. 1059, 109 S.Ct. 1328, 103 L.Ed.2d 596 (1989). In this case, the Commonwealth proved beyond a reasonable doubt that Foster's "... acts of killing were intentional and resulted in multiple deaths...." Nonstatutory aggravating factors have also been allowed in the

penalty phase of a trial. *Tamme v. Commonwealth, supra,* 759 S.W.2d 51 (Ky. 1988). But specific acts of uncharged misconduct are not factors which a jury may consider in its determination of a defendant's penalty and, therefore, are inadmissible in the penalty phase. We agree with the trial court that the acts of misconduct were relevant to support the co-defendant's claim of duress but we must hold that their admission in a joint trial was nevertheless highly prejudicial to Foster. The admissibility of the evidence would have been proper if the penalty phase of the trial had been severed to allow Foster to have her sentence determined by the jury first.

Foster argues that she was prejudiced by the introduction of letters which she had written to Powell while in jail. The letters were introduced into evidence by Powell and by the Commonwealth. Foster argues that the letters were a surprise because no notice was given by Powell, and Foster was unable to examine the letters until the day before their introduction into evidence. We find this argument meritless since the letters were voluntarily written by Foster to her co-defendant. The letters which the Commonwealth sought to introduce and which were discussed during pretrial suppression proceedings should have signaled to Foster's counsel of record that their client was writing to Powell and that the contents potentially would be used at trial by either her co-defendant or the Commonwealth. In *United States v. Jacobsen,* 466 U.S. 109, 117, 104 S.Ct. 1652, 1658, 80 L.Ed.2d 85 (1984), the United States Supreme Court stated:

> It is well-settled that when an individual reveals private information to another, he [or she] assumes the risk that his confidante will reveal that information to the authorities and if that occurs the Fourth Amendment does not prohibit governmental use of that information.

■ We turn next to whether the trial court erred in admitting the letters as substantive proof. The trial court ruled that portions of the letters were admissible as to Powell's mitigation claim because Foster's expert had testified that Foster had a "great propensity for violence," and be-

cause the expert had used the letters in forming his opinion.

Powell first used the letters during her testimony on direct examination. Selected passages include threats made by Foster to Powell including, "Bitch, you're going to die," "plan your extermination," "I can fuck your whole world up," and "don't make me hurt you."

The Commonwealth next utilized the letters to impeach Powell's claim of fear of Foster. In one letter, Foster wrote to Powell: "Donna said a lot of people thinks we cut one man's dick off because the paper said the sex couldn't be determined on one of the bodies. Hmm. What did you do when I wasn't looking? Ha Ha." The trial court allowed the prosecutor to cross-examine Powell on this passage because Foster had already used substantial portions of the letter to cross-examine Powell. Another letter read by the prosecutor stated that Foster was prepared to accept a stiffer sentence than Powell. A third letter stated, "We will for sure get the death penalty if we say we don't remember most things," and "Do not make up a defense."

We agree with the trial court that the letters were relevant to Powell's mitigation, but their admission at a joint hearing was error due to the prejudicial effect which the letters had on Foster's mitigation. The contents of the letters were highly inflammatory and cumulatively went beyond what was necessary for Powell to prove her mitigation. The admission of the contents of the letters, which the Commonwealth had introduced for impeachment of Powell, was equally prejudicial and irrelevant, with very little probative value. The effect of the admission of the letters was to further taint the penalty phase of the joint trial as to Foster and to deny her a fair and impartial trial.

Foster next claims that she was prejudiced by Powell's expert testimony on the "battered wife syndrome."

Dr. Nietzal, a clinical psychologist, was called by Powell to support her mitigation claim of duress and domination by Foster. Nietzal stated that the relationship between Foster and Powell had "similar char-

acteristics" to the syndrome because Powell had "learned helplessness" towards Foster. He explained that the appellants met some of the conditions of the syndrome but not all, because the two women were not married, did not always live together, and one was not financially dependent on the other. Dr. Nietzal stated that Powell had told him that she had "freaked out" on the night of the murders. His final opinion was that Powell was intoxicated, acted under extreme emotional disturbance, and acted under fear and duress of Foster when necessary to spare her own life.

■■■■ The trial court erred in the admission of the testimony of the battered wife syndrome by Powell's expert. We have recognized that the battered wife syndrome has been generally accepted in the medical community as a mental condition. *Commonwealth v. Rose*, Ky., 725 S.W.2d 588 (1987). But the syndrome by its own definition is inapplicable to the relationship which these co-defendants may have had with each other. A witness who has been qualified as an expert in a certain field is not allowed to testify about the subject unless it has been proven the testimony is competent; that is, does it aid the jury? *See Alexander v. Swearer*, Ky., 642 S.W.2d 896 (1982); *See also Island Creek Coal Co. v. Rodgers*, Ky.App., 644 S.W.2d 339 (1982). The admission of the testimony was error because the prejudicial effect far outweighed its probative value.

## IX. CONCLUSION

■■■ In retrospect, we find that the trial court's decision not to sever the penalty phase of the appellants' joint trial was reversible error as to Appellant Foster. The accumulated errors in the admission of prior acts of misconduct, contents of letters written by Foster to Powell, and evidence regarding the battered wife syndrome by Powell's expert all stem from the improvident decision of the trial court to hold a joint penalty phase. Individually, these errors might be considered by this Court to be harmless, but viewed together or "cumulatively," their commission requires reversal of Foster's sentence. The respective

evidence in mitigation offered by the appellants to the jury was antagonistic to each other. The penalty phase as to Foster was unfairly tainted by the appearance of Powell's counsel acting as a second prosecutor.

In finding reversible error in the joint penalty hearing, we nevertheless understand completely why the trial court did not follow his original correct instincts to grant the severance. There is always the hope that the tightrope can be walked without falling, and thus the tremendous savings in trial time and effort for court, attorneys, parties, and witnesses can be effected. Furthermore, once the decision not to sever is made, it is irrevocable. We suspect here that before the penalty phase was very many hours old, the court and the attorneys came to the grim realization that it was too late to "unring the bell" and that any death penalty verdicts returned by the jury would only be ephemeral in duration. It is lamentable that such an extraordinary effort by every participant must be repeated even in part, but justice clearly requires it in this instance. Notwithstanding this conclusion, we find no prejudice to Powell, for she clearly benefited from the non-severance.

We hereby affirm the judgment of conviction and sentence against Tina Hickey Powell. The verdicts of guilt as to LaFonda Fay Foster are affirmed but the sentences of death are reversed and remanded for a new penalty hearing.

STEPHENS, C.J., and COMBS, LAMBERT, LEIBSON and REYNOLDS, JJ., concur.

WINTERSHEIMER, J., concurs in part and dissents in part by separate opinion.

WINTERSHEIMER, Justice, concurring in part and dissenting in part.

I respectfully dissent from that part of the majority opinion which reverses Foster's sentence of death because the sentence was properly entered by the trial judge pursuant to the jury's recommendation after both defendants received a fundamentally fair, joint trial.

Foster failed to prove that she had been prejudiced by the joint trial. RCr 9.16.

There has not been a "clear showing of an abuse of discretion" in regard to the trial court's refusal to sever the trials notwithstanding the trial court's previous decision to grant severance. *Epperson v. Commonwealth*, Ky., 809 S.W.2d 835, 838 (1991). As recognized by the majority, "there is a strong policy in favor of joint trials when charges will be proved by the same series of acts...." *United States v. Blakeney*, 942 F.2d 1001, 1010 (6th Cir. 1991). In this case, it is admitted by Foster and Powell that they committed the murders of the victims. Each of the five victims was killed by the defendants over the course of the same evening with the defendants stopping twice to find bullets, and once to repair the gun which they were using to shoot the victims. Foster and Powell were seen with one another throughout the evening and were eventually arrested together while at the hospital. The only question, as Powell recognized in her opening statement on the first day of trial, was not whether the defendants were guilty, but what penalty the jury would impose upon them for their outrageous and senseless behavior. Under these facts, and for the purpose of judicial economy, the trial judge properly held a complete joint trial.

Foster also failed to prove that she and Powell had antagonistic defenses, or that the evidence as to one defendant tended to directly incriminate the other. *Tinsley v. Commonwealth*, Ky., 495 S.W.2d 776, 780 (1973). Prior to and during trial, Foster and Powell admitted their respective participation in the murders, and there can be no complaint now that the evidence presented at trial by the Commonwealth or a co-defendant directly incriminated one defendant over the other.

The "mitigation" of duress raised by Powell in the penalty phase of the joint trial was not antagonistic to the mitigation evidence presented by Foster. A potentially antagonistic defense is only one of the factors for the trial judge to consider in determining whether to grant a severance. *Epperson, supra.* "The movant must establish that the jury would be unable 'to separate and treat distinctively evidence that is relevant to each particular defendant on trial.'" *Blakeney, supra,* at 1011, citing *United States v. Gallo,* 763 F.2d 1504, 1525 (6th Cir.1985). "Even if the movant establishes some potential jury confusion, this confusion must be balanced against the need for speedy and efficient trials." *Id.* Moreover, "We presume that the jury will be able to sort out the evidence applicable to each defendant and render its verdict accordingly." *Id.,* citing *United States v. Horton,* 847 F.2d 313, 317 (6th Cir.1988).

The jury in this case was able to ponder the evidence presented by the defendants in support of their respective mitigating claims in arriving at an appropriate sentence. It is within the exclusive province of the jury to determine from the evidence whether one defendant is more culpable than his or her co-defendant, and thereafter to apply this conclusion to their respective sentences. For the first time, a majority of this Court applied the severance standards found in *Tinsley, supra,* to mitigating evidence and has unintentionally made it virtually impossible for a trial court of this Commonwealth to conduct a joint trial where one co-defendant alleges commission of a crime under duress.

The trial judge properly allowed Powell and the Commonwealth to cross-examine Foster's experts, Dr. Noelker in the guilt phase and Lane Veltkamp in the penalty phase, about the specific acts of charged and uncharged misconduct which the experts had used in formulating their respective opinions. It is unchallenged by the majority that the Commonwealth may fully inquire into, on cross-examination, evidence used by an expert in forming his opinion. 31 Am.Jur.2d, *Expert and Opinion Evidence* § 92. This inquiry must include bad acts where the expert has, as in this case, heavily relied upon the knowledge of bad acts in formulating an opinion. Otherwise, the Commonwealth has been effectively hindered in its cross-examination of a defendant's expert witness.

The bad acts were admissible in both the guilt and penalty phase of the defendants' joint trial. It is undisputed that Foster

herself first brought her character into issue through the testimony of Dr. Noelker, and later in the penalty phase, through her videotaped testimony which allowed Foster to testify at the trial without being cross-examined. The bad acts used by Powell in supporting her mitigating claim of duress were cumulative to the bad acts which Foster herself had already admitted on direct examination. It should be noted that Powell had cross-examined Veltkamp about uncharged misconduct, and not the Commonwealth, and therefore, the same rules about inquiry into a defendant's character do not apply.

The trial judge did not abuse his discretion when he admitted the Foster letters in support of Powell's mitigation. The probative value far outweighed the prejudicial effect which the contents may have had on Foster's mitigation. The jury properly considered the defendants' respective mitigations and reached a just verdict.

I do not believe any reversible error occurred in the admission of Powell's expert testimony on the battered wife syndrome. The expert specifically stated that the relationship between Foster and Powell could be "compared" to the battered wife syndrome. The expert did not state that Powell was a battered wife, but merely tried to explain why Powell did not try to run from Foster on the night of the murders. The admission of the testimony was not error because the probative value to Powell far outweighed the alleged prejudicial effect to Foster. No abuse of discretion occurred.

The sentence entered by the trial court against Foster should be affirmed. I concur with the balance of the majority opinion which affirms the convictions of both appellants and Powell's sentence.